**The CITY OF BURLINGTON, an Iowa Municipal Corporation, Plaintiff,**

**v.**

**Francis C. TURNER, as Administrator, Federal Highway Administration,**

**and**

**John A. Volpe, as Secretary, United States Department of Transportation, Defendants.**

**Civ. No. 5-104-D.**

United States District Court,
S. D. Iowa,
Davenport Division.
Jan. 12, 1972.

Robert E. Stine, Springfield, Ill., J. C. Riley, and James Fisch, Burlington, Iowa, for plaintiff, City of Burlington.

Allen L. Donielson, U. S. Atty., and John B. Grier, Asst. U. S. Atty., Des Moines, Iowa, for defendants.

Don A. Petruccelli, Davenport, Iowa, Lyman R. Fort, Stronghurst, Ill., for intervening petitioners, Lucy Olson et al.

Donald H. Sitz, Davenport, Iowa, for International Bridge, Tunnel & Turnpike Assn.

MEMORANDUM AND ORDER

HANSON, Chief Judge.

This is an action for a declaratory judgment and for injunctive relief brought under the Administrative Procedure Act, 5 U.S.C. § 501 et seq., in which this Court is asked to review a decision of the Federal Highway Administrator ("Administrator") that the toll structure set by plaintiff City of Burlington for its toll bridge over the Mississippi River is unreasonable and unjust under the Bridge Act of 1906, 33 U.S.C., §§ 491–498.

## I. STATEMENT OF FACTS AND ADMINISTRATIVE DECISIONS REVIEWED.

There is no disagreement as to the background facts of this case. The MacArthur Bridge, focus of this dispute, is a two lane, all-weather, 1000 foot cantilever span, that carries U. S. Highway 34 over the Mississippi River, a navigable waterway, between Iowa and Illinois at Burlington, Iowa. It was constructed in 1917 at a cost of $200,000 by the Citizens' Bridge Company, a private corporation, pursuant to a Congressional consent granted in 1915, 39 Stat. 1. This consent expressly made the MacArthur Bridge subject to the Bridge Act of 1906, 33 U.S.C., § 491 et seq., which among other things, provides in 33 U.S.C., § 494 that:

> If tolls shall be charged for the transit over any bridge constructed under the provisions of said sections, of engines, cars, street cars, wagons, carriages, vehicles, animals, foot passengers, or other passengers, such tolls shall be reasonable and just, and the Secretary of the Army may, at any time, and from time to time, prescribe the reasonable rates of toll for such transit over such bridge, and the rates so prescribed shall be the legal rates and shall be the rates demanded and received for such transit.[1]

The right to amend, alter or repeal this provision was reserved in both the 1915 consent and in the 1906 Act itself, 33 U.S.C., § 498, but has never been exercised.

In 1923, the bonds of Citizens' Bridge Company were paid off, and title to the MacArthur Bridge was transferred to the City of Burlington, an Iowa municipal corporation, and plaintiff here. Congressional consent to this transfer was given in 1951, 65 Stat. 193, and again the bridge was expressly made subject to the Bridge Act of 1906, with the right

1. By virtue of 49 U.S.C. § 1655(g) (4) (A), the powers vested in the Secretary of the Army have been transferred to the Secretary of Transportation, who has in turn delegated them to the Federal Highway Administrator by 49 C.F.R. § 1.48(i) (1).

to amend, alter or repeal the consent again reserved. This consent was preparatory to a major reconstruction of the MacArthur Bridge undertaken in 1954. For this, $900,000 in bonds were issued, of which $167,000 are yet outstanding, but covered by a $200,000 reserve. At present, the piers of the Burlington bridge are undergoing reinforcement.

Tolls have been charged on the MacArthur Bridge from the date of its completion. From 1933 until 1968 these remained unchanged, at a rate of 25¢ per car, with a non-transferable receipt available, good for a toll-free return passage within twenty-four hours. These rates sufficed to produce $4.5 million in revenue prior to 1954, and another $4,145,838 in the years from 1957 to 1968. Of this latter sum, $1,724,088 was applied to debt service, operating and maintenance expenses, and other bridge expenses, while $2,394,926 was openly transferred to the plaintiff's operating fund, to help defray the expenses of various municipal services. No complaint was made of the rates of tolls, or of the diversion to municipal use of some $269,000 annually, prior to 1968.

In 1968, however, plaintiff abolished the free return receipt, avowedly to produce an additional $140,000 per year to give raises to its police and firemen.[2] Since approximately two-thirds of the traffic over the bridge each day is local, consisting primarily of local Illinoisans seeking access to Burlington for employment and services, since the nearest alternate bridge is at Fort Madison, 18 miles distant, and since certain vehicles are compelled to use the MacArthur Bridge because of route restrictions, there were numerous and exceptionally vehement protests that the tolls charged for passage over the bridge were unlawful, since bridge revenues were being diverted by plaintiff for general municipal purposes. Implicitly at issue here is plaintiff's right to do so.

Certain complainants brought the matter of the Burlington bridge tolls to the attention of the Federal Highway Administrator, asserting that the new toll structure was unreasonable and unjust, and requesting that the Administrator prescribe reasonable rates. These complainants, Lucy Olson, et al., have appeared in this proceeding and have been permitted by the Court to file briefs and to present oral argument.

On January 8, 1970, the Federal Highway Administrator, in 35 F.R. 399, assigned the matter of the MacArthur Bridge tolls to a Hearing Examiner, Mr. Robert N. Burchmore, for hearings under the Administrative Procedure Act, 5 U.S.C., §§ 554–558, on the question of the reasonableness and justness of plaintiff's toll structure. Hearings were accordingly held on April 6 and 7, 1970. Those present included various Illinois citizens and communities, four trucking companies, and the City of Burlington.

Mr. Burchmore filed his report on September 10, 1970. Therein, he first considered the issue of plaintiff's authority under Iowa law to impose tolls in excess of that needed for maintenance, operation, bond interest and bond retirement, and properly concluded that this issue was beyond the scope of the Administrator's permissible inquiry.[3] He recognized that the toll rate charges of 1968 may have been impolitic and infuriating, but further noted that the burden of proving them *unreasonable* rested on complainants, as required by 5 U.S.C., § 556. Considering briefs, precedents, the legislative history of bridge acts and enabling acts, as well as current federal and state law, the Hearing Examiner concluded that the case was one of first impression under the Bridge Act of 1906. He proceeded to compare the tolls charged by plaintiff with tolls charged elsewhere, and such conditions and circumstances of their assessment as

2. The average annual revenue growth from 1957 to 1967 had been 3.4% per year, from 1.5 million cars in 1957 to 2.1 million in 1967.

3. Likewise, this issue is not now before this Court.

the structure of the bridge, whether it was a draw span, replacement cost, etc. He then calculated net annual percentage return at 7%, and concluded that this was not unreasonable in the light of the definition of "reasonable and just" given in Banton v. Belt Line Ry. Corp., 268 U.S. 413, 422–423, 45 S.Ct. 534, 537, 69 L.Ed. 1020 (1925):

> A commission or other legislative body, in its discretion, may determine to be reasonable and just a rate that is substantially higher than one merely sufficient to justify a judicial finding in a confiscation case that it is high enough to yield a just and reasonable return on the value of the property used to perform the service covered by the rate. The mere fact that a rate is nonconfiscatory does not indicate that it must be deemed to be just and reasonable. It is well known that rates substantially higher than the line between validity and unconstitutionality properly may be deemed to be just and reasonable, and not excessive or extortionate.

The Hearing Examiner found no limitation on this concept, or on the diversion of bridge revenues on bridges subject to the 1906 Bridge Act in any other bridge act or enabling act. Accordingly, ruling that the complainants had not sustained their burden of proof, he concluded that plaintiff's toll schedules were not unreasonable or unjust.

Complainants accordingly filed exceptions and resistance to the Hearing Examiner's report with the Federal Highway Administrator. In his Opinion and Order, dated April 30, 1971, he, too, found that the authority of the City of Burlington to charge tolls producing revenue greater than needed for bridge costs was an inappropriate state law issue, and likewise noted that this was a case of first impression, without a body of prior formal interpretative rulings, merely two *ad hoc* proceedings under a different statute, the General Bridge Act of 1946, 33 U.S.C., §§ 525–533.[4]

The Opinion of the Administrator rejected the use of some comparison test for a determination of reasonableness, holding that the evidence in the record was insufficient to support the conclusions reached under the test used by the Hearing Examiner, that reliance upon *In re Camden Bridge Tolls*[5] and *In the Matter of Walt Whitman and Benjamin Franklin Bridge Tolls*[6] was misplaced, both because the *Whitman/Franklin* opinion expresssly stated that the comparison test was only one of many factors to be considered, and because both administrative opinions were premised upon Clarksburg-Columbus Short Route Bridge Co. v. Woodring,[7] which held that determinations of reasonableness and justness under the Bridge Act of 1906 were to be governed by the same standards used by the Interstate Commerce Commission in its railroad freight rate cases. The Administrator dismissed *Woodring* out of hand as a "dubious rationale,"[8] and likewise rejected the Hearing Examiner's conclusion that the Bridge Act of 1906 precluded scrutiny of the uses of bridge toll revenues, holding that the uses of bridge toll revenues are a proper subject of scrutiny in determining whether a particular set of tolls are reasonable and just.

Noting that "reasonable and just" is not specifically defined in the 1906 Bridge Act, the Administrator concluded that the phrase was chosen to provide a flexible standard for applying legislative policy to changing circumstances, such that the Administrator was thereby charged with broad discretion in defining the term. In this discretion, he argued, judicial constructions and Con-

4. In re Camden Bridge Tolls (Department of the Army, May 4, 1954); In the Matter of Walt Whitman and Benjamin Franklin Bridge Tolls (Department of Transportation, Federal Highway Administration, September 11, 1968.)

5. *Id.*

6. *Id.*

7. 64 App.D.C. 44, 89 F.2d 788 (1937).

8. Opinion and Order of the Administrator, April 30, 1971, at 13.

gressional policy in *other* legislation might properly be considered.

For his judicial construction, the Administrator looked to Covington & Lexington Turnpike Road Co. v. Sandford, 164 U.S. 578, 17 S.Ct. 198, 41 L.Ed. 560 (1896), which held that what is reasonable and just for the public must be considered, as well as reasonableness to the owner, so that factors other than mere return on investment must be considered.

For his Congressional policy as to bridge tolls, the Administrator looked to certain documents and enactments from the period 1935–1967 to see what meaning should be given to the Bridge Act of 1906. He looked first at *Forms for Bridge Bills* [9] which were suggested to be used in bridge enabling acts subsequent to 1935. These limited the use of bridge revenues to maintenance, repair, operation and amortization. Secondly, the Federal Highway Administrator looked at 23 U.S.C., § 129, enacted July 31, 1945,[10] which permits federal funds only for bridges limiting toll revenues to bridge costs, and ultimately planned to be toll-free. Thirdly, the General Bridge Act of 1946 [11] was regarded. This contains the identical language of the Bridge Act of 1906 [12] in one section,[13] but in another requires tolls to be adjusted to provide a fund sufficient to pay for maintenance, repair, operation and amortization not longer than thirty years, with the bridge thereafter to be toll-free.[14] Finally, the Administrator looked to a House Subcommittee Report [15] which stated that toll facilities should only be a last resort, and then allowed only under provisions that will ultimately make them toll-free. From these four Congressional sources, the Administrator concluded

> that the fixing of just and reasonable rates for toll bridges under the General Bridge Act of 1906 should be governed by the concept embodied in toll bridge legislation over the past forty years—that the rates of toll should be limited to an amount necessary to provide a fund sufficient to pay for the reasonable cost of maintaining, repairing, and operating the bridge and its approaches under economical management, and to provide a sinking fund for amortization of the bridge indebtedness.[16]

As further support for this conclusion, the Administrator cited the need for "greater consistency of Federal policy and practice" [17] with respect to toll bridges, as well as the need to insure "that the general public and interstate commerce are not burdened by unreasonable and unjust tolls." [18] Since the toll structure for the MacArthur Bridge clearly brought in more revenue than permitted by the limitations he set, the Administrator concluded that that structure was *per se* unreasonable and unjust, in that it permitted plaintiff a profit from the bridge ownership.

In conclusion, the Administrator sets out, as a finding, a general definition of "reasonable and just" as used in the Bridge Act of 1906:

> In order for bridge tolls to be reasonable and just within the meaning of the General Bridge Act of 1906, such tolls shall be so prescribed and adjusted as to yield sufficient revenues to pay for those items of cost directly attributable to the owning, operating, maintaining, repairing, and managing of the bridge facility and its approaches, including the establishment of such reserve funds as

9. Committee Print, Commerce Committee, 74th Cong., 1st Sess. (May 3, 1935).

10. 59 Stat. 507 (1945).

11. 33 U.S.C. §§ 525–533.

12. 33 U.S.C. § 494.

13. 33 U.S.C. § 526.

14. 33 U.S.C. § 529.

15. Relation of Toll Facilities to the Federal Aid Highway Program, H. Rept. No. 597, 90th Cong., 1st Sess. (August 24, 1967).

16. Opinion and Order of the Administrator, *supra* note 8, at 17.

17. *Id.*, at 18.

18. *Id.*

would be required under prudent management to protect investments in the facility and provide for its ultimate freeing. These costs are limited to the reasonable costs of maintenance, repair, reconstruction, operation (which includes toll collection), administration (which includes costs of a bridge superintendent and necessary support staff, or an engineering consultant, and costs of all-risk insurance), and interest payments on any outstanding indebtedness (including fiduciary and agent fees). After payment of these annual costs, surplus tolls, if any, may be placed into a reserve fund reasonably sufficient to provide for foreseen or unforeseen contingencies, such as flood damage and other extraordinary maintenance and repair items involving the bridge. Any remaining toll revenues may be placed into a sinking fund to provide for the redemption of any outstanding loans or other indebtedness by the scheduled maturity date or dates.

Because plaintiff's present toll structure did not meet this definition, it was specifically determined to be unreasonable and unjust. The City of Burlington was accordingly ordered to produce a new toll schedule within 60 days that would conform to the Administrator's definition of "reasonable and just" under the Bridge Act of 1906, or else suffer the imposition of a conforming toll schedule by the Federal Highway Administration.

On June 1, 1971, the City of Burlington petitioned the Federal Highway Administrator for reconsideration of his Opinion and Order of April 30, 1971. The Administrator accordingly stayed the effectiveness of that Order on June 18, 1971, but denied further arguments, and on August 31, 1971, issued a new Opinion and Order on Reconsideration, which merely affirmed his previous findings, and gave the City of Burlington 30 days to submit a conforming toll schedule, or suffer the imposition of a conforming schedule. The City of Burlington thereupon commenced this action to review and set aside defendant Administrator's opinions and orders, to restrain their enforcement, and to declare them unlawful, arbitrary, capricious and an abuse of discretion.

The original complainants before the Federal Highway Administration, eleven individuals and the Gladstone Grain Co., quickly petitioned to intervene, and on October 12, 1971, further petitioned for an injunction restraining plaintiff from disbursing tolls collected subsequent to October 1, 1971, and asked that these be refunded. Plaintiff resisted, and without ruling on either petition, the Court set this matter for hearing on a preliminary injunction on November 3, 1971.

Prior to that hearing, the Federal Highway Administrator on October 15, 1971, entered an Order prescribing a toll schedule which supposedly met the definition of reasonableness set out by him in his opinion of April 30th. This schedule was to take effect December 1, 1971. To arrive at this schedule, the Administrator noted that reserves were sufficient to cover indebtedness. He then used a high estimate of annual costs for maintenance, operation, management and repair, together with traffic estimates, to find a set of tolls that would produce revenues slightly greater than estimated costs, with the surplus to be a reserve for contingencies and to make the bridge ultimately toll-free. This prescribed schedule would have effected a substantial reduction in tolls, reducing rates for cars and light trucks from 25¢ to 10¢ or, in the case of commuters, from 25¢ to 7½¢. Heavy truck tolls would be approximately halved, as would other types of tolls.

Also prior to the hearing held on November 3, 1971, this Court received a second petition to intervene from the International Bridge, Tunnel and Turnpike Association, Inc. At the hearing, without expressly ruling on the petitions to intervene, this Court permitted all present to make oral argument and to subsequently file briefs. It was agreed and understood that rather than rule solely on a preliminary injunction, the Court would endeavor to make a ruling

on the merits before December 1, 1971, the effective date of defendant Administrator's prescriptive Order.

On November 30, 1971, finding it impossible to make a ruling by December 1st, due to the complexity of the issue, the length of the submissions, and the unavailability of certain materials, and finding that irreparable harm would be done plaintiff by any reduction of tolls, so that on a balance of the harms to the various parties and to the various public interests less irreparable harm would be done by so doing, this Court ordered a stay of enforcement of the orders of defendant Administrator pending a ruling on the merits. That ruling follows.

## II. SCOPE OF REVIEW AND GENERAL PRECEPTS.

The Court recognizes at the outset the limited scope of review given an administrative determination under the Administrative Procedure Act. Where an agency has interpreted a general statute lacking specific precepts, the Court is limited to determining that the record warrants the interpretation, that the reasons given therefor are clearly enunciated, that findings of fact are supported by substantial evidence, that all factors required to be considered have been considered, that there is a reasonable and error-free basis in law for conclusions drawn, and finally that there has been no frustration of an ascertainable Congressional will, or incursion on the Congressional prerogative.[19] In making such determinations, the Court is ordinarily governed by the doctrine that a reviewing court must defer to an administrative interpretation of a statute by the agency charged with its enforcement, and may not substitute its expertise for that of the administering agency.[20] However, this rule does not apply where there is a dearth of agency expertise, and the statute in question has neither been continuously interpreted, nor examined contemporaneously with its enactment.[21] Such is the case here, for this is admittedly a question of first impression for defendant Administrator,[22] and there has been neither contemporaneous nor continuous interpretation of the statute in question.

This does not mean to say, however, that the decision of the Federal Highway Administrator is without weight. Where more than one rational solution to the problem presents itself, the Court must still uphold that of the Administrator, and may not choose that which it would choose on a hearing *de novo*, or require the administrative agency to exclude all other reasonable conclusions,[23] although it may properly consider a conflict in findings when an agency overrules its Hearing Examiner.[24]

## III. OPINION AND ORDER OF THE ADMINISTRATOR, APRIL 30, 1971.

The crux of the matter before the Court is the Federal Highway Administrator's interpretation of "reasonable and

19. Atlantic Refining Co. v. F.T.C., 381 U.S. 387, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1965); American Ship Building Co. v. N.L.R.B., 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965); American Mail Line, Ltd. v. Gulick, 133 U.S.App.D.C. 382, 411 F.2d 696 (1969); Trans World Airlines, Inc. v. C.A.B., 128 U.S.App. D.C. 126, 385 F.2d 648 (1967); City of Lawrence v. C.A.B., 343 F.2d 583 (1st Cir. 1965); Jenkins v. Macy, 237 F.Supp. 60 (E.D.Mo.1964), aff'd 357 F.2d 69 (8th Cir.); Scott v. United States, 166 F.Supp. 851 (S.D.N.Y.1958).

20. Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966).

21. Land O' Lakes Creameries, Inc. v. Commodity Credit Corp., 265 F.2d 163 (8th Cir. 1959).

22. Opinion and Order of the Administrator, *supra* note 8, at 3.

23. Udall v. Tallman, *supra* note 20; Udall v. Washington, Virginia and Maryland Coach Co., 130 U.S.App.D.C. 171, 398 F. 2d 765 (1968).

24. American Cyanimid Co. v. F.T.C., 363 F.2d 757 (6th Cir. 1966).

just" in § 4 of the Bridge Act of 1906, 33 U.S.C., § 494, in determining whether present toll rates are "reasonable and just" within the meaning of the statute.

In making his determination, the Administrator at the outset rejected as a "dubious rationale" the only case that has ever dealt with an interpretation of the 1906 Bridge Act in its 66 years of existence, Clarksburg-Columbus Short Route Bridge Co. v. Woodring, *supra,* note 7.[25] The Court is far less certain than the Administrator that *Woodring* can so airily be dismissed as "dubious" and "*dicta.*" Judicial construction of a statute must always prevail over a contrary administrative construction,[26] and *Woodring* has stood unchallenged for a period of some 35 years, without contrary precedent or administrative interpretation. The holding relevant here, that bridge toll determinations under the 1906 Bridge Act are governed by the same principles as in railroad freight rate making, is not *dicta,* but is basic to the specific ruling, that the profit structure of competing bridges must be taken into account in setting tolls at a reasonable and just level, because the effect of rate making on competing lines is an important principle that the *Woodring* court borrowed from railroad rate making. Even the dissent therein conceded this point.

Implicit in *Woodring* is the right to a fair and reasonable return, and the necessity that the determining agency consider "all matters proper to be taken into consideration in fixing rates." [27] The right to such a fair monetary return from public use is more explicitly set out in such cases as Dayton-Goose Creek Ry. Co. v. United States, 263 U.S. 456, 44 S.Ct. 169, 68 L.Ed. 388 (1924); F. P. C. v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), and Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968), although precisely what test of fair return is to be used may vary. What is clear, however, is that minimum permissible rates are those that are greater than confiscatory, upon consideration of a multitude of factors, Baltimore & Ohio R. R. Co. v. United States, 345 U.S. 146, 73 S.Ct. 592, 97 L.Ed. 912 (1953), although rates above this level are not *per se* reasonable and just. Thus, a reasonable and just rate, at least in other areas of regulation, is one that is fair to the public, yet gives a fair return to the provider of the service in question, though perhaps varying with different economic situations and input factors. In this regard, the Court cannot overlook the fact that the identical phrase, "reasonable and just," is to be found in many other statutory enactments, including notably the Interstate Commerce Act of 1887, 49 U.S.C., § 1(5). It seems reasonable to infer, therefore, that this phrase is something of a term of art, having been used in many prior and subsequent acts, including prior enabling toll bridge legislation, that Congress did not idly use this phrase in the Bridge Act of 1906, that identical statutory language in different statutes should be given much the same meaning, and that if Congress had intended a different standard it would have used different terminology. Consequently, the Court is of the opinion that the analogy drawn by *Woodring* is a vital one, and that the view of the Administrator that *Woodring* is "dubious" is arbitrary, capricious, and incorrect as a matter of law.[28]

It is very true, as the Administrator points out, that neither the 1906 statute nor its legislative history provides a specific definition of "reasonable and just." It is probably equally true that

25. Opinion and Order of the Administrator, *supra* note 8, at 13.

26. Bruhn's Freezer Meats v. United States Department of Agriculture, 438 F.2d 1332 (8th Cir. 1971).

27. 89 F.2d, at 791.

28. The order of the Administrator does not indicate any consideration of the effect of reduced tolls on competing bridges. It may thus violate the direct injunction of *Woodring.*

Congress intended the term to have a certain flexibility so that it might, in the discretion of the Administrator, be tailored to varying multi-factoral circumstances.[29] The Court cannot agree, however, that this means a standard to be altered, chameleon-like, every time the Administrator detects a slight change in Congressional policy subsequent to enactment. This improperly usurps the legislative role.

The Administrator gives great weight to the judicial interpretation of "reasonable and just" in Covington & Lexington Turnpike Road Co. v. Sandford, *supra,* wherein it is held that reasonableness and justness of rates *to the public* is a proper consideration in determining whether a set of rates is reasonable and just under a statute. Nothing in *Sandford* necessarily precludes a fair return to the owner of a facility when the public interest is considered. Furthermore, *Sandford* not only provides support for the holding in *Woodring* that railroad rate principles are to apply to transportation toll facilities, and for the proposition in Banton v. Belt Line Ry., 268 U.S. 413, 45 S.Ct. 534, 69 L.Ed. 1020 (1924), that rates which are so unreasonably low as to destroy the value of property are an unconstitutional violation of due process, citing St. Louis & San Francisco Ry. Co. v. Gill, 156 U.S. 649, 15 S.Ct. 484, 39 L. Ed. 567 (1895), but expressly recognizes the necessity for considering fair return in determining if a set of tolls is reasonable and just, citing the Railroad Commission Cases, 116 U.S. 307, 6 S.Ct. 334, 29 L.Ed. 636 (1886).[30]

The Federal Highway Administrator places greatest reliance, however, not on any intimation of the meaning of "reasonable and just", on any prior legislative history of the Bridge Act of 1906, or on subsequent interpretations of that statute, but on some allegedly discernable and consistent Congressional policy over the past 40 years that tolls should be limited to an amount sufficient only to defray bridge costs. Although there is ample authority that subsequent Congressional enactments may be relevant in statutory interpretation to some degree, as where the Congressional intent of the prior enactment is discussed, where there is an evolving pattern which may point up the intent of the earlier statute, or where negative implications may be drawn from differences in the statutes,[31] it cannot be said that subsequent expressions of altered Congressional policy made some 30 years after an enactment either are directly relevant in determining the intent of the earlier statute, or permit the alteration of an accepted interpretation of that statute to conform with the changed policy. To the contrary, intended differences in statutes must be given effect, and the very fact that the 1906 Bridge Act has been allowed to stand without amendment in the face of alleged changes in Congressional policy, despite specific reservations of the right to amend, can only indicate a Congressional intent that the 1906 Act be given a different reading than subsequent legislation, a Congressional belief that it was dealing with differentiated situations, and an intent that uniformity in bridge toll treatments be contraindicated, despite the Federal Highway Administrator's avowed quest for such a goal.[32]

29. Paradoxically, the standard prescribed by the Administrator, pegged as it is solely to bridge costs, is not the kind of 'flexible standard' he himself envisions, but is rigid, and incapable of changing to meet altered economic or situational circumstances.

30. By establishing such a mechanical standard pegged solely to bridge costs, the Administrator furthermore seems to preclude the due regard for the public interest which *Sandford* requires to be considered in each case.

31. Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); N.L.R.B. v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 87 S.Ct. 2001, 18 L. Ed.2d 1123 (1967); F.P.C. v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944).

32. Opinion and Order of the Administrator, *supra* note 8, at 18.

This Court has far more difficulty than the Administrator in discerning a *consistent* Congressional policy with regard to bridge tolls over the past 40 years. There is one general policy with regard to all bridges over navigable waters, whether interstate or not,[33] a different general policy for privately-owned interstate bridges,[34] and a third general policy for publicly owned interstate bridges.[35] In addition to these general standards, some bridges subject to the 1906 Act have specific limitations on bridge tolls,[36] some bridges ordinarily subject to statutory limitations on bridge tolls have been specifically relieved therefrom,[37] and some bridges have been relieved of any requirements with respect to bridge tolls.[38] From this panoply of distinguishable treatments, the Court cannot conclude that there is one consistent Congressional policy that

> rates of toll should be limited to an amount necessary to provide a fund sufficient to pay for the reasonable cost of maintaining, repairing, and operating the bridge and its approaches under economical management, and to provide a sinking fund for amortization of the bridge indebtedness.[39]

On the contrary, the Court finds a discernable Congressional intent that bridges governed by the 1906 Bridge Act generally, and the MacArthur Bridge in particular, should not be subject to this standard. This intent is most obviously manifest in the General Bridge Act of 1946, from which the Administrator borrows, almost *verbatim*, his conclusions about Congressional policy. This Act expressly states that it does *not* apply to bridges covered by the 1906 enactment,[40] and reflects both a Congressional intent that such standards as were therein set forth were to be kept apart from those of the 1906 Act, and a definite Congressional belief that these standards were distinct. Were it otherwise, Congress could have merely amended the 1906 Act, or could have provided that the new provisions were to apply to all bridges. To say otherwise would render at least 33 U.S.C., §§ 529 and 530, and most likely the entire 1946 enactment, superfluous, since it would add nothing not already in the statute books by virtue of the interpretation of "reasonable and just" in the 1906 Bridge Act herein reviewed. Obviously, the Court cannot hold as a matter of law that Congress intended to pass redundant and superfluous legislation, yet this is precisely what the decision of the Federal Highway Administrator would require us to hold, solely in the name of some questionable notion of uniformity.

The General Bridge Act of 1946 first sets out in 33 U.S.C., § 526 the identical standards set out in Section 4 of the 1906 Bridge Act, that tolls shall be "reasonable and just." This is to apply to all bridges covered by the Act. Then, in 33 U.S.C., § 529, Congress sets forth a more restrictive standard to apply solely to publicly-owned bridges. It is this which the Administrator incorporates to apply under the 1906 Bridge Act, not only to publicly owned bridges, but to *all* bridges, public or private, governed by the 1906 Bridge Act. This conclusion of incorporation is inescapable, since the language in the Administrator's opinion is identical, down to the last phrase, save for the requirement under the 1946 Act that bridges become toll-free within 30 years.[41]

33. Bridge Act of 1906, 33 U.S.C. §§ 491–498.

34. General Bridge Act of 1946, 33 U.S.C. § 526.

35. General Bridge Act of 1946, 33 U.S.C. § 529.

36. Cf., e. g., 66 Stat. 734 (1952).

37. Cf., e. g., 66 Stat. 738 (1952).

38. Cf., e. g., 69 Stat. 552–53 (1955).

39. Opinion and Order of the Administrator, *supra* note 8, at 17.

40. 33 U.S.C. § 530.

41. Following the Administrator's rationale to the letter as to Congressional policy would require this as well, and the Administrator does provide for the eventual rendering of the MacArthur Bridge toll-free in his prescriptive order of October 15, 1971.

Regardless of whether the defendant incorporated the letter or only the spirit of 33 U.S.C., § 529, the Court must conclude that "reasonable and just" tolls must mean some quantity *more than* the maximum allowed by § 529. If "reasonable and just" means only what the Administrator says it does, Section 529 becomes superfluous and repetitious. However, the existence of two standards for differing situations can only evince a Congressional belief that the two standards did not mean the same thing.

This view of the 1946 enactment as requiring a different standard for bridge tolls than the 1906 Act is reinforced by three subsequent Congressional consents for bridges. In 1951, Congress consented to plaintiff's ownership of the MacArthur Bridge. If Congress believed that tolls should be governed by the policy defendant Administrator asserts, i. e., that of the 1946 General Bridge Act, it could most easily have made the bridge subject to the 1946 Act, especially as it had reserved that right in all prior pertinent enactments. In fact, Congress did this very thing the following year for a nearby bridge, the Iowa-Illinois Memorial Bridge at Bettendorf, Iowa.[42] It likewise consented to exempt certain Delaware River bridges from the requirements of 33 U.S.C., § 529, but still required that tolls be reasonable and just. From these considerations, one can only conclude that there was, and is, a very real Congressional intent that the two standards be distinct, and that the Burlington bridge is to be governed solely by the less restrictive "reasonable and just" standard, the only limit on the use of bridge tolls in any *applicable* legislation.

The 1935 bridge enabling act forms, which the Administrator also uses as evidence of a Congressional policy limiting bridge toll revenues to bridge costs,[43] likewise force the conclusion that the Administrator misperceived the Congressional intent as to the "reasonable and just" standard. These forms were suggested for use in drafting enabling legislation for toll bridges. Significantly, these forms have never been used in connection with the MacArthur Bridge, although there was ample opportunity to do so when consent was given to plaintiff's ownership in 1951. Furthermore, if "reasonable and just" means what the Administrator says it means, the promulgation of such forms would appear to have been unnecessary. Finally, since the forms say that bridges are subject to the Bridge Act of 1906, but then proceed to place further specific limits on toll revenues, the obvious belief is that the 1906 Act does not contain such limits, yet the Administrator has attributed such limits to the 1906 Act in his Order.[44]

Another factor to which this Court may give some weight in reviewing an administrative interpretation of a statute is a long-standing interpretation thereof.[45] In this case, in 66 years under the Bridge Act of 1906, and despite 40 years of allegedly contrary Congressional policy, the right to a fair return from bridge toll revenues has never before been questioned, and plaintiff has without question been permitted to divert tolls to non-bridge purposes since acquisition of the bridge in 1923.

From a careful analysis of the Opinion and Order of the Administrator dated April 30, 1971, from a reading of Clarksburg-Columbus Short Route Bridge Co. v. Woodring, 64 App.D.C. 44, 89 F.2d 788 (1937), Covington & Lexington Turnpike Road Co. v. Sandford, 164

42. 66 Stat. 734 (1952).

43. Forms for Bridge Bills, Committee Print, *supra* note 9.

44. The Administrator further cites a 1945 statute, 59 Stat. 507, and a 1967 House report, Relationship of Toll Facilities to the Federal Aid Highway Program, *supra*, note 15. Neither is particularly relevant, since the former clearly is inapplicable to the MacArthur Bridge, and the latter has never been enacted into legislation.

45. United States v. Leslie Salt Co., 350 U.S. 383, 76 S.Ct. 416, 100 L.Ed. 441 (1956).

U.S. 578, 17 S.Ct. 198, 41 L.Ed. 560 (1896) and other applicable case law, from a perusal of other statutes employing a standard similar to the Bridge Act of 1906, from consideration of longstanding interpretations of that Act, and most especially from analysis and consideration of subsequent bridge toll statutes and other examples of an alleged bridge toll policy asserted to be highly significant, the conclusion is inescapable that the Opinion of the Administrator is grossly lacking in a correct basis in law, wrongfully arrogates the Congressional prerogative, and is accordingly arbitrary and capricious. An administrative agency must follow an ascertainable Congressional mandate, N. L. R. B. v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965), and if it does not, it is the duty of this Court to so adjudge, R. V. McGinnis Theatres & Pay TV, Inc. v. Video Independent Theatres, Inc., 386 F.2d 592 (8th Cir. 1967), and to relegate the problem to the Administrator for further consideration in the light of this opinion, United States v. Jones, 336 U.S. 641, 69 S.Ct. 787, 93 L.Ed. 938 (1949); Zuber v. Allen, 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969).

This does not mean to say, however, that the Federal Highway Administrator may not look at the uses of toll revenues in determining whether a particular toll schedule is reasonable and just under § 4 of the Bridge Act of 1906. The Court only holds herein that it is a violation of Congressional intent and statutory spirit to conclude that use of bridge revenues for non-bridge purposes is *per se* unreasonable and unjust, to look solely at revenue uses, and to limit bridge toll revenues to bridge costs, for the reasons herein given. Upon a proper reconsideration of the multiplicity of factors required to be considered, Baltimore & Ohio R. R. Co. v. United States, 345 U.S. 146, 73 S.Ct. 592, 97 L. Ed. 912 (1953),[46] it is entirely possible that the Federal Highway Administrator may again determine that plaintiff's toll rate structure is unreasonable and unjust.[47] However, he must use the correct

46. Among the factors that may properly be considered, and in many cases *must* be considered are the administrative record; prior precedents; the legislative history of the Bridge Act of 1906 and of the phrase 'reasonable and just' therein; analogies to freight rate and turnpike toll determinations, Clarksburg-Columbus Short Route Bridge Co. v. Woodring, 67 App.D.C. 44, 89 F.2d 788 (1937); comparisons with other bridge tolls and the circumstances and conditions of their assessment; the effect on competing facilities, *Woodring, supra*; a fair return to the owner, by whatever standard, and whether the rates are confiscatory, Baltimore & Ohio R.R. Co. v. United States, 345 U.S. 146, 73 S.Ct. 592, 97 L.Ed. 912 (1953); the physical characteristics of the bridge, including the width and strength of the span, load limits, topography, and whether it is a draw span; the replacement cost of the bridge; bridge costs, *Permian Basin Area Rate Cases, supra* note 31; the amount and nature of bridge traffic; transportation conditions and flows; traffic origins and destinations; the necessity for revenue incentives to bridge owners; economic conditions and price movements; the uses of bridge revenues; the history of bridge tolls on the bridge under consideration, both in terms of the peculiar toll structure and of custom and usage; relevant and/or competing public interests, Covington & Lexington Turnpike Road Co. v. Sandford, 164 U.S. 578, 597, 17 S.Ct. 198, 41 L.Ed. 560 (1896); the effect of a particular toll structure on individual classes of users, Ayrshire Colleries Corp. v. United States, 335 U.S. 573, 69 S.Ct. 278, 93 L.Ed. 243 (1948); the competing interests of bridge owners and bridge users; externality costs, the special benefits to a particular class of bridge users, such as local Illinois residents here, from the free use of non-bridge facilities, such as city streets and police, which facilities are subsidized by residents of the City of Burlington absent user fees; and finally, the method by which toll rate structures are derived, F.P.C. v. Hope Natural Gas Co., supra note 31.

47. It is equally possible that the Administrator will find that the present toll structure is reasonable and just when all factors are considered, or perhaps that the most reasonable and just toll structure is that which existed prior to the repeal of the free return provision in 1968, which structure persisted for 35 years

criteria in doing so, and if he does not, this Court may again be compelled to overrule his determination.

## IV. THE ORDER OF THE ADMINISTRATOR PRESCRIBING REASONABLE RATES OF TOLL, OCTOBER 15, 1971.

The Federal Highway Administrator concedes on page 3 of his Brief filed November 15, 1971 that if he is found to have applied the wrong standard in his decision of April 30, 1971, then the rates he prescribed in his Order of October 15, 1971 cannot be reasonable and just. However, even if the Administrator had applied the correct standard, the subsequent Order cannot be sustained, because there is no basis in the record to support the particular toll structure prescribed, no findings as to the impact of the prescribed tolls on each user class, Ayrshire Colleries Corp. v. United States, 335 U.S. 573, 69 S.Ct. 278, 93 L.Ed. 243 (1945), no discernable reason why each particular toll rate has been chosen, and no factual statement why these rates are deemed reasonable and just.

Furthermore, in his Order of October 15, 1971, the Administrator admittedly takes an inflated figure of bridge costs, and then admittedly chooses a set of toll rates that will generate quite a bit more than he says is the maximum allowable, because certain classes of passage are not considered in the determination of total revenue. He thus clearly violates his precepts of reasonableness and justness. The Administrator further provides that excess revenues should be used to establish a fund to eventually render the MacArthur Bridge toll free. This provision is not only a clear violation of the Order of April 30th, which does not call for the eventual freeing of the Burlington bridge, but it is doubtful that the Administrator could have found any statutory authority for prescribing such a provision, especially under some definition of "reasonable and just" in the Bridge Act of 1906.[48]

It is the opinion of the Court that it is incumbent upon the Administrator not only to set forth an interpretation of "reasonable and just" that has a reasonable basis in law, but in any prescriptive orders thereunder to faithfully follow his own standards, and furthermore to set out in such prescriptive order some sort of basis for the particular choice of toll rates, so that they may be adequately reviewed to determine if there is a reasonable basis for concluding that they are reasonable and just. For failure to do so, the Order of October 15, 1971, cannot be allowed to stand, irregardless of the viability of any prior Orders of the Administrator.

## V. REMEDY AND ORDER.

There remains only the question of remedy. Although in the past it has usually been held proper to remand to the agency for further consideration in the light of the ruling of the Court, Austin v. Jackson, 353 F.2d 910 (4th Cir. 1965), more recent authority holds that where there have been no new agency theories advanced for sustaining the agency determination, and no request by the Government for remand, remand need not be ordered, Zuber v. Allen, 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969). Functionally, this makes little difference, since the Federal Highway Administrator is still free to make a new determination of whether Plaintiff City of Burlington's toll rate structure is reasonable and just within the intendment of Section 4 of the Bridge Act of 1906, 33 U.S.C. Section 494. It is sufficient here that judgment shall be entered declar-

without complaint. However, the optimum toll structure is not for this Court to determine; it must defer to the expertise and fact-finding ability of the Federal Highway Administration in this regard.

48. If bridges subject to the Bridge Act of 1906 are to be made toll-free, it is for Congress and not for the Federal Highway Administrator to do so, as a matter of legislative policy and not as a matter that has been left to administrative discretion in any existing enactment.

ing the opinions and orders of the Federal Highway Administrator of April 30, 1971 and August 31, 1971 to be arbitrary, capricious and without rational basis in law, declaring the order of the Federal Highway Administrator of October 15, 1971, prescribing reasonable rates of toll for transit over the MacArthur Bridge at Burlington, Iowa to be arbitrary, capricious, without rational basis in law, and without an adequate basis in the record, and accordingly permanently enjoining the enforcement of these orders.