**DELAWARE RIVER PORT AUTHOR-ITY, Plaintiff,**

v.

**Norbert T. TIEMANN, as Administrator, Federal Highway Administration and William T. Coleman, Jr., as Secretary, United States Department of Transportation, Defendants,**

and

**City of Philadelphia, Defendant-Intervenor.**

**Civ. A. No. 75-1219.**

United States District Court, D. New Jersey.

Nov. 12, 1975.

---

Alexander Feinberg, Evoy & Feinberg, Cherry Hill, N. J., Duane, Morris & Heckscher, Philadelphia, Pa., of counsel, by Roland Morris, Philadelphia, Pa., for plaintiff Delaware River Port Authority.

Jonathan L. Goldstein, U. S. Atty., by Frederick W. Klepp, Asst. U. S. Atty., for defendants Norbert T. Tiemann and William T. Coleman, Jr.; Dowell H. Anders, Deputy Chief Counsel, Federal Highway Administration, U. S. Dept. of Transp., of counsel.

Sheldon L. Albert, Sol., City of Philadelphia, by Herbert Smolen, Deputy City Sol., for Intervenor, City of Philadelphia.

## OPINION

BROTMAN, District Judge.

This case involves the review of an order setting tolls on bridges owned and operated by the Delaware River Port Authority (hereinafter "Authority" or "DRPA")[1] by the Federal Highway Administrator (hereinafter "Administrator").

The Administrator's authority to prescribe tolls derives from Section 503 of the General Bridge Act of 1946, 33 U.S.C. § 526. As originally enacted by Congress the power to set "reasonable and just" tolls was delegated to the Secretary of the Army. Act of August 2, 1946, ch. 753, 60 Stat. 847–48. This power was transferred to the Secretary of Transportation pursuant to the Department of Transportation Act. 49 U.S.C. § 1655(g)(4)(B). The Secretary of Transportation delegated this power to the Federal Highway Administrator. 49 C.F.R. § 1.48(i)(2).

Pursuant to his statutory authority, the Administrator, on May 19, 1975, prescribed a new toll schedule, the essential elements of which are: a reduction in the basic passenger car and truck (up to 7,000 pounds gross weight) cash toll per crossing from the presently existing rate of 60 cents to 55 cents; the retention of the commuter rate 30-day decal at $12.00,

---

1. The DRPA operates the Benjamin Franklin, Walt Whitman, Commodore Barry and Betsy Ross Bridges, the latter not yet opened to traffic. It also operates the Lindenwold highspeed rail commuter line (PATCO) and maintains a World Trade Division to promote the Port of Philadelphia. Opinion and Order of the Federal Highway Administrator, May 19, 1975 (hereinafter "Administrator's Opinion"), at 2, 3. PATCO rates are not the subject of these proceedings, since they are regulated by the Interstate Commerce Commission. 49 U.S.C. § 1(5).

but a reduction in the cash toll per crossing from 10 cents to 5 cents; a reduction in the carpool commuter rate from $10.00 for 40 tickets (25 cents per crossing) to $4.00 for the book of 40 tickets (10 cents per crossing); and a reduction on the bus rate of $1.00 to 80 cents for two-axle buses and $1.50 to $1.20 for three-axle buses. Opinion and Order of the Federal Highway Administrator, May 19, 1975 (hereinafter "Administrator's Opinion"), at 17, Appendix A. This schedule was to have taken effect on August 1, 1975, but the court ordered a stay of the imposition of the schedule, pending litigation on the merits.[2]

The proceedings below were conducted by the Administrator pursuant to §§ 5–9 of the Administrative Procedure Act, 5 U.S.C. §§ 554–558 (originally enacted as Act of June 11, 1946, ch. 324, 60 Stat. 237, 239–43), and the Bridge Toll Procedural Rules, 49 C.F.R. §§ 310.1–310.14.[3] Jurisdiction of the court is founded upon 28 U.S.C. § 1331[4] and § 1337.[5]

This court must, within the proper scope of its review, consider the statutory requirement of "reasonable and just" tolls, 33 U.S.C. § 526, the relationship of this requirement to the bond covenant between the Authority and its bondholders, due process claims asserted by the DRPA and the possible application of the National Environmental Policy Act (NEPA). Ultimately, the court must decide whether the Administrator's Order and Opinion is in accord with the relevant statutory criteria, the product of a reasoned decision-making process, and supported by "substantial evidence." Implicated in the court's review are, perforce, issues of profound public importance, including the continued ability of the DRPA to operate its public facilities as well as to meet existing obligations to its bondholders, the conservation of fuel, and the reasonableness and justness of the tolls as they affect the bridge-using public.

## I. PROCEDURAL HISTORY

The current proceeding began when the DRPA instituted a toll increase, effective April 1, 1972.[6] This increase was effected "for the stated purpose of attaining additional revenue to complete the financing of a capital construction program and to operate and maintain those facilities." Administrator's Opinion, at 3.

Complaints were heard from various parties. On August 10, 1972 the Federal Highway Administrator issued a Notice of Public Hearing.[7] The Administrator directed that a formal hearing be held in Philadelphia to permit interested parties to submit evidence on the reasonableness and justness of the Authority's tolls.

A prehearing conference was held on September 9, 1972, pursuant to 49 C.F.R. § 310.8(b). Hearings were held from

2. See this court's opinion on the DRPA's motion for stay, filed July 23, 1975.

3. See Notice of Public Hearing, 37 *Federal Register* 16560 (1972).

4. Section 1331(a) provides:
 The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States.

5. Section 1337 provides:
 The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies.

*See Murphy v. Colonial Federal Savings and Loan Association*, 388 F.2d 609, 615 (2nd Cir. 1967); *Davis v. Romney*, 490 F.2d 1360, 1365–66 (3rd Cir. 1974).

6. The DRPA had previously instituted an increase in tolls on February 1, 1968. At the direction of the Federal Highway Administrator hearings were held in June, 1968. On August 1, 1968 the Hearing Examiner issued a Report and Recommended Order, and on September 11, 1968 the Opinion of the Administrator was issued. See Administrator's Opinion, Appendix B.

7. 37 *Federal Register* 16560 (1972).

September 28 through October 7, 1972. On December 29, 1972, the Administrative Law Judge, Honorable Louis G. LaVecchia, issued a Recommended Decision, pursuant to 49 C.F.R. § 310.12(a), finding that the present toll schedule was not reasonable and just, and recommending that the pre-April 1972 toll schedule be reinstated. The Administrator issued a Tentative Opinion and Order on June 1, 1973 which accepted the Recommended Decision.[8] On November 5, 1973 the Administrator issued an Opinion, finding that the Authority's toll schedule was not reasonable and just, and ordering a new schedule effective January 1, 1974, providing for a fifty (50) cent cash toll and a thirty-five (35) cent commuter toll. On November 21, 1973 the DRPA filed a Petition for Reconsideration which was denied by the Administrator on December 3, 1973.

At this point the focus of the proceedings shifted to the federal courts. The Authority filed a complaint for declaratory judgment and a permanent injunction against the enforcement of the Administrator's Order of November 5, 1973 in the United States District Court for the Eastern District of Pennsylvania on December 5, 1973. A temporary stay pending litigation and final relief was also sought. (This action was dismissed by order "without prejudice to the rights of either party to bring further action of the nature comprehended under the above caption or of any other nature." Civil Action No. 73–2749, Order of September 27, 1974.)

On December 11, 1973 representatives of the Authority met in Washington, D. C. with the Federal Highway Administrator to discuss the effect of the impending energy crisis on the DRPA. In light of the gasoline shortage and the energy crisis, the adoption of a new schedule of tolls for the Authority was considered.

As a result thereof, the Administrator issued a Decision and Order on December 21, 1973 permitting the DRPA to put its new proposed schedule into effect "at least on an interim basis." This interim toll schedule is the one presently in operation. In his decision, the Administrator stated quite explicitly that "the question whether the revenues produced by the new schedule will be excessive remains open." The hearings were ordered reopened so that evidence bearing on the reasonableness and justness of the toll schedule, in light of the then-current situation, could be adduced.

Hearings were held in Philadelphia on April 23, 24, and 25, 1974 before the Administrative Law Judge, Honorable Edward V. Alfieri. The Authority presented evidence in support of the interim toll schedule. The City of Philadelphia, Automobile Club of Southern New Jersey, Pennsylvania Motor Truck Association, Keystone Automobile Club, Motorists for Lower Tolls (a group of New Jersey commuters), Transport of New Jersey, and the United States Environmental Protection Agency all appeared in opposition to the toll schedule. The Federal Highway Administration's Office of Chief Counsel appeared as public counsel representing the public interest.

The Administrative Law Judge issued a Recommended Decision on October 16, 1974. He found that the present tolls were not reasonable and just and recommended that the toll schedule set forth in the Administrator's Order of November 5, 1973 be instituted.

Subsequent thereto, on February 10, 1975, the Administrator ordered the Authority to submit additional documents relating to the Authority's refunding program undertaken in June 1974, after the April 1974 hearing had concluded. (Exhibits 136–139). Following the submission of these documents to all record parties for comment, the Administrator

8. The Administrator issued Supplemental Tentative Conclusions on June 22, 1973. Oral argument was held on June 29, 1973.

reopened the record to include Exhibits 136–139 in evidence.[9]

On May 19, 1975 the Administrator issued his Opinion and Order which is now before this court on review. The Administrator found that the interim toll schedule set forth in the Order of December 21, 1973 was not reasonable and just, and, as noted, set forth in Appendix A a new schedule, to take effect August 1, 1975.

The Authority filed a petition for reconsideration on June 4, 1975 and request for a stay, which was denied by the Administrator on July 10, 1975. The Administrator on July 10, 1975 also supplemented his Opinion of May 19, 1975. Administrator's Order, July 10, 1975 (hereinafter "Administrator's Supplemental Opinion").

Shortly thereafter, on July 14, 1975 the DRPA filed a complaint seeking declaratory judgment, a temporary stay pending litigation and final relief against Norbert T. Tiemann, Federal Highway Administrator, and William T. Coleman, Jr., Secretary, United States Department of Transportation. Leave to intervene was granted to the City of Philadelphia, which had participated in the proceedings below. After considering the briefs and testimony in support of the stay, this court on July 23, 1975 stayed the effective date of the Administrator's Order.

The matter is now before the court for final determination. Cross motions for summary judgment have been filed pursuant to Fed.R.Civ.P. 56.

## II. THE STATUTORY REQUIREMENT OF "REASONABLE AND JUST" TOLLS

Section 503 of the General Bridge Act of 1946, which governs the rate of tolls on bridges owned and operated by the DRPA,[10] provides as follows:

If tolls shall be charged for the transit over any interstate bridge of engines, cars, street cars, wagons, carriages, vehicles, animals, foot passengers, or other passengers, such tolls shall be reasonable and just, and the Secretary of Transportation may, at any time, and from time to time, prescribe the reasonable rates of toll for such transit over such bridge, and the rates so prescribed shall be the legal rates and shall be the rates demanded and received for such transit. 33 U.S.C. § 526.

As noted, the Secretary of Transportation delegated the power to prescribe reasonable and just tolls to the Federal Highway Administrator. 49 C.F.R. § 1.-48(i)(2).

The "reasonable and just" standard found in § 503 of the General Bridge Act of 1946 has never been the subject of interpretation by the courts.[11]

9. See discussion of DRPA's due process challenge to the Administrator's use of Exhibits 136–139. Text *infra*, Section VI.

10. *See* Congressionally approved Compact creating the DRPA. Act of July 17, 1952, Pub.L.No.82–573, 66 Stat. 738, 747.

11. In *City of Burlington v. Turner*, 336 F. Supp. 594, 607 n. 46 (S.D.Iowa 1972), *aff'd as modified*, 471 F.2d 120 (8th Cir. 1973) the court identified certain factors which the Administrator might, and in some cases must, consider in prescribing reasonable and just tolls under the Bridge Act of 1906. 49 U.S.C. §§ 491–498. (The 1906 Act sets forth the general Congressional policy concerning all bridges over navigable waters in contrast to the 1946 Act which applies specifically to publicly-owned interstate bridges. 336 F. Supp. at 605.) Some of these factors provide a useful frame of analysis in this case. They include: the legislative history of the statute, whether the rates are confiscatory, relevant and/or competing interests, effect of the rates on individual classes of users, competing interests of bridge owners and users, method by which the rate is derived, use of bridge revenues, and the amount and nature of bridge traffic.

Other factors identified in *City of Burlington*, including fair return to the bridge owner, necessity of revenue incentives to the bridge owner, and analogies to freight rate and turnpike toll determinations, have little, if any, application, since the DRPA is a quasi-governmental, non-profit entity. See text *infra* and note 14.

Any comparison which the DRPA seeks to make with bridge tolls charged by other authorities, another factor identified in *City of*

However, the term "reasonable and just" is not uncommon in the federal regulatory scheme. *E. g.*, Interstate Commerce Act, 49 U.S.C. § 1(5) (railroads); 49 U.S.C. § 905 (water carriers); Natural Gas Act, 15 U.S.C. § 717c; Federal Aviation Act, 49 U.S.C. § 1482. In *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 605, 64 S.Ct. 281, 289, 88 L.Ed. 333 (1944), a case arising under the Natural Gas Act, the Supreme Court defined reasonable and just rates as "[r]ates which enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed . . . ." More recently the Court reaffirmed the validity of the above criteria, while noting in addition that the regulating agency must "provide appropriate protection to the relevant public interests, both existing and foreseeable." *Permian Basin Area Rate Cases*, 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968). Included within the relevant public interests is the protection of consumer interests, here that of the bridge users. *Id.* at 798, 88 S.Ct. 1344; *Democratic Central Committee v. Metropolitan Area Transit Commission*, 158 U.S.App.D.C. 107, 485 F.2d 886, 911–12 (1973), *cert. denied*, 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974); *see also City of Chicago v.*

*Federal Power Commission*, 458 F.2d 731, 751 (D.C.Cir. 1971), *cert. denied*, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972); *MacDonald v. Federal Power Commission*, 164 U.S.App.D.C. 248, 505 F.2d 355, 363–64 (1974).[12]

■ The principles developed in *Hope, Natural Gas, supra*, and *Permian Basin, supra*, were fashioned to set reasonable and just rates which private, profit-oriented utilities might charge.[13] Such utilities are, as noted, entitled to rates which allow them to attract capital and compensate investors. But the Delaware River Port Authority is not such a utility. Rather, it is a public agency.[14] Therefore the DRPA has no right to profit from public use of its facilities.

Indeed, when Congress gave its consent to the Compact creating the DRPA, it was particularly concerned that the Authority not be allowed to retain excess revenue which would have the effect of watering its capital. Consequently, in exempting the Authority from the thirty-year amortization requirement of § 506, 33 U.S.C. § 529, Congress sought to limit the revenues retained by the DRPA. The report of the House Public Works Committee on the Compact legislation, H.R.Rep.No.

*Burlington*, is rejected because a proper foundation was not laid with respect to 1972 Exhibits 67–73 and 1974 Exhibit 125. See 1974 Transcript, Vol. II, 57–61, 98–101. A meaningful comparison would, of necessity, take careful account of the operational, financial, and debt structure of other authorities. The record is devoid of such an analysis. Furthermore, the DRPA municipal bond expert testified that he did not know whether the authorities listed in Exhibit 125 were subject to the General Bridge Act of 1946. 1974 Transcript, Vol. II, 100.

12. The principle that fares or tolls must be fair and equitable to the transportation consumers applies both where the agency providing the service is entitled to operate at a profit, *e. g., Democratic Central Committee v. Metropolitan Area Transit Comm'n, supra*, and where, as here, the DRPA, by virtue of the Compact creating it, does not operate at a profit.

13. Of course, "when private property is devoted to a public use, it [becomes] subject to public regulation." *Munn v. Illinois*, 94 U.S. 113, 130, 24 L.Ed. 77 (1877).

14. Article I of the Compact defines the DRPA as a "body corporate and politic . . . [constituting] the public corporate instrumentality of the Commonwealth of Pennsylvania and the State of New Jersey for the following public purposes, and which shall be deemed to be exercising an essential governmental function in effectuating such purposes . . . ." Political scientists might identify the public at large as the stockholder to which the Authority is ultimately accountable. See Remarks of Herbert Smolen, Deputy City Solicitor, City of Philadelphia, 1972 Transcript, Vol. II, at 395; Testimony of Richard G. Gilmore, Commissioner, DRPA, Vol. V, at 1223.

2293, 82 Cong., 2d Sess. 3 (1952), states:

> With respect to the other point emphasized by the Bureau of the Budget and the Bureau of Public Roads—that the bills originally introduced might permit the perpetuation of tolls on bridges under the jurisdiction of the Delaware River Port Authority, contrary to the provisions of the 1946 Bridge Act, as amended, and the policy established by the Congress that interstate toll bridges should become toll-free when the cost had been amortized by toll collections, the committee has inserted a proviso in the bill which, although specifically exempting the said port authority from the operation of the 30-year limitation provided for by section 506 of the General Bridge Act, as amended, requires that the collection of tolls shall cease at the expiration of 50 years from the date of the opening to traffic by the port authority of the bridge latest constructed, or acquired thereby, after the effective date of this legislation. The proviso further requires that the rate of such toll shall be subject to the provisions of section 503 of the General Bridge Act of 1946, as amended. Therefore, since any possible watered capital values would be reflected in toll rates, the Secretary of the Army would have the power to prevent the passing on of such watered capital values to the public by controlling the toll rates to be charged, and assuring that they will be reasonable and just.

■ Reasonable and just tolls prescribed pursuant to Section 503 of the General Bridge Act of 1946 should therefore allow the DRPA to generate revenues "sufficient to achieve a return . . . to support its total activities, including the operation of the bridges, the PATCO rapid transit system, and the World Trade Division, and provide sufficient coverage for financings." Administrator's Opinion, at 10. The Authority's ability to maintain its operations and meet its bond commitments are essential aspects of the concept of reasonable and just tolls.[15] Equally important are the relevant public interests, including the public policy favoring the conservation of fuel [16] and the aforesaid interest of the toll-paying public in reasonable and just tolls.

■ Consistent with the above factors, which give content to the statutory term, is the concept of a "zone of reasonableness." Within such a zone, the agency may "employ price functionally in order to achieve relevant regulatory purposes . . . ." *Permian Basin, supra* 390 U.S. at 797, 88 S.Ct. at 1376. The mere fact that the value of the regulated property may be reduced does not invalidate the regulation, unless said regulation becomes confiscatory. *Hope Natural Gas, supra* 320 U.S. at 601, 64 S.Ct. 281; *Permian Basin, supra* 390 U.S. at 770, 88 S.Ct. 1344; *Federal Power Commission v. Texaco, Inc.*, 417 U.S. 380, 391–92, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974). If the Administrator's new toll schedule falls within this "zone of reasonableness," it must be upheld.

To summarize, a reasonable and just rate of tolls is a rate which enables the DRPA to maintain its public facilities, allows it to meet its commitments to the bondholders, and remains consistent with the other public interests.

---

15. Although the covenant with the bondholders is one important factor to consider, "the prevailing price in the market place cannot be the final measure of 'just and reasonable' rates . . . ." *Federal Power Commission v. Texaco, Inc.*, 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974). See discussion concerning the effect of the bond covenants on the Administrator's power to set reasonable and just tolls. Text *infra*, Section V.

16. "It is the Administrator's judgment that within the definition of reasonable and just tolls, the criteria of national interest and public policy must, at this time, also be inserted. The national interest and public policy in this case being the conservation of fuel." Administrator's Opinion, at 14.

## III. SCOPE OF REVIEW

The Opinion and Order of the Federal Highway Administrator now before this court on review is the culmination of a process which began with public hearings [17] conducted pursuant to the Bridge Toll Procedural Rules, 49 C.F.R. § 310.1 et seq.[18] These proceedings, the ultimate purpose of which was to determine reasonable and just tolls to be charged by the DRPA, were adjudicatory in nature, a process to be distinguished from administrative rule-making wherein an administrative agency promulgates policy-type rules affecting an entire industry. *See United States v. Florida East Coast Ry.*, 410 U.S. 224, 245, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973).

■ Where, as here, an adjudicatory hearing has been held "to produce a record that is to be the basis of agency action," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), the "substantial evidence" test limits the scope of the court's review. *Id.* at, 414, 91 S.Ct. 814.[19] "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to sup-

port a conclusion [Citations omitted]." *Consolidated Edison Co. v. National Labor Relations Board*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *accord, Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).[20]

■ When Congress enacted the Administrative Procedure Act in 1946, it codified the "substantial evidence" test articulated in *Consolidated Edison, supra. Universal Camera Corp. v. National Labor Relations Board*, 340 U.S. 474, 483 n. 16, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Congress provided in section 10(e) of the APA, 5 U.S.C. § 706(2) (E):

> The reviewing court shall . . .
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be . . .
>
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute . . . .

It is manifest that the "substantial evidence" test governs this court's review. *Citizens to Preserve Overton Park, supra.*[21]

17. The Notice of Public Hearing which initiated the administrative proceedings advised the public that hearings would be held "for the purpose of affording all interested parties the opportunity to submit, orally or in writing, data, views, facts and arguments . . . ." 37 *Federal Register* 16560 (1972).

18. *See*, in particular, 49 C.F.R. § 310.7.

19. *See also Gables By The Sea, Inc. v. Lee*, 365 F.Supp. 826, 831 (S.D.Fla.1973), *aff'd* 498 F.2d 1340 (5th Cir. 1974), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 775 (1975); *Citizens Airport Committee v. Volpe*, 351 F.Supp. 52, 57 (E.D.Va.1972).

20. "Substantial evidence" has been compared to evidence sufficient, in a jury trial, to justify the court's refusal to direct a verdict. *National Labor Relations Board v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660 (1939).

*See generally* 4 K. Davis, *Administrative Law Treatise* § 29.02 (1958); Stason, "Substantial Evidence' in Administrative Law," 89 U.Pa.L.Rev. 1026, 1038 (1941).

21. Under either criterion set forth in § 706 (2)(E), the substantial evidence test applies. First, the Notice of Public Hearing, 37 *Federal Register* 16560, states that the Administrator decided to conduct a hearing under 5 U.S.C. §§ 554–558, and an examination of the record below demonstrates beyond doubt that the proceedings were conducted pursuant to the procedures set forth in §§ 556 and 557. Second, this court reviews here the record of an agency hearing. Congress has provided that "[t]he Secretary of Transportation shall promulgate regulations establishing guidelines governing any increase in tolls for use of any bridge constructed pursuant to . . . the General Bridge Act of 1946." 33 U.S.C. § 526a. The Secretary promulgated regulations providing for an "on the record"

■ To determine whether the Administrator's decision is supported by substantial evidence, the whole record must be considered, including that which might detract from the Administrator's determination. *Universal Camera, supra,* 340 U.S. at 488, 71 S.Ct. 456. Although the review is on the whole record, such review is necessarily limited. The court's "duty is at an end when it becomes evident that the [Administrator's] action is based upon substantial evidence and is consistent with the authority granted by Congress." *Securities and Exchange Commission v. Chenery Corp.,* 332 U.S. 194, 207, 67 S.Ct. 1575, 1582, 91 L.Ed. 1995 (1947); *accord, National Broadcasting Co. v. United States,* 319 U.S. 190, 224, 63 S.Ct. 997, 87 L.Ed. 1344 (1943).

■ In applying the "substantial evidence" test the courts give proper deference to the expertise of the administrative body. *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). As stated in *Consolo, supra* at 621, 86 S.Ct. at 1027:

> In this area agency determinations frequently rest upon a complex and hard-to-review mix of considerations. By giving the agency discretionary power to fashion remedies, Congress places a premium upon agency expertise, and, for the sake of uniformity, it is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency.

"Full allowance must be given . . . for the reality that agency matters typically involve a kind of expertise —sometimes technical in a scientific sense, sometimes more a matter of specialization in kinds of regulatory programs." *Greater Boston Television Corp. v. Federal Communications Commission,* 143 U.S.App.D.C. 383, 444 F.2d 841, 850 (1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).[22]

determination by the Federal Highway Administrator. 49 C.F.R. §§ 310.10–310.12.

22. It is plain that the prescription of reasonable and just rates necessarily calls for the agency to make pragmatic accommodations, in light of the particular factual circumstances of a given proceeding, including the relevant public interests. *Federal Power Commission v. Natural Gas Pipeline Co. of America,* 315 U.S. 575, 586, 62 S.Ct. 736, 86 L.Ed. 1037 (1942); *Hope Natural Gas, supra,* 320 U.S. at 602, 64 S.Ct. [281] at 288; *Wisconsin v. Federal Power Commission,* 373 U.S. 294, 309, 83 S.Ct. 1266, 10 L.Ed.2d 357 (1963); *Federal Power Commission v. Louisiana Power and Light Co.,* 406 U.S. 621, 642, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972).

Furthermore, the agency's determination must be considered in terms of the result reached, rather than the particular path chosen. *Hope Natural Gas, supra; Wisconsin v. FPC, supra.* As the Supreme Court observed in *Hope Natural Gas:*

> It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end.

Accordingly, the courts should give great deference to the agency's determination, as such determination is the product of a dynamic process by which the agency breathes life into a statutory term, "reasonable and just," which appears, in cold print at least, to be somewhat amorphous. *Cf. Public Service Coordinated Transport v. Delaware River Port Authority,* 114 N.J.Super. 334, 341, 276 A.2d 378, 382 (App.Div.), *aff'd,* 59 N.J. 531, 284 A.2d 529 (1971), *cert. denied,* 406 U.S. 930, 92 S.Ct. 1772, 32 L.Ed.2d 132 (1972).

In *City of Burlington, supra* at 602, the court observed that where, as in the instance of the Bridge Act of 1906, "there is a dearth of agency expertise, and the statute in question has neither been continuously interpreted, nor examined contemporaneously with its enactment," deference need not be given to the administrative determination. But, this is the third case in which the reasonableness and justness of toll charged by the DRPA has been considered by the Administrator (or his predecessor, the Secretary of the Army), the other two cases being the Camden Bridge Tolls case of 1953 and the 1968 proceedings alluded to in note 6, *supra. See U. S. Dep't of Transportation, A Study of Federal Statutes and Regulations Governing Toll Bridges* 40–46, 58–60; *cf. Federal Highway Administra-*

But, full allowance for the agency's expertise does not mean that the agency possesses unbridled discretion. The reviewing court must satisfy itself that the agency's determination is the result of a "reasoned decision-making" process. *Greater Boston Television Corp., supra* at 852; *cf. International Harvester Co. v. Ruckelshaus,* 155 U.S. App.D.C. 411, 478 F.2d 615, 652 (1973) (Bazelon, C. J., concurring).[23] This being so, it is therefore incumbent upon the agency "to spell out its reasoning." *Citizens Association of Georgetown, Inc. v. Zoning Commission,* 477 F.2d 402, 408 (D.C.Cir. 1973).[24] Justice Harlan articulated this concern for rationality in the administrative decision-making process as follows:

> Judicial review of the Commission's orders will therefore function accurately and efficaciously only if the Commission indicates fully and carefully the methods by which, and the purposes for which, it has chosen to act, as well as its assessment of the consequences of its orders . . . . *Permian Basin, supra* 390 U.S. at 792, 88 S.Ct. at 1373.

Because the process by which an administrative agency reaches its determination must reflect reasoned decision-making, *Greater Boston Television Corp., supra,* the agency's determination can be upheld only "on the same basis articulated in the order by the agency itself." *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 169, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962); *SEC v. Chenery Corp., supra* 332 U.S. at 196, 67 S. Ct. 1575.

The Supreme Court has recognized that "[t]he process of rate making is essentially empiric," and that "[t]he stuff of the process is fluid and changing—the resultant of factors that must be valued as well as weighed." *Board of Trade v. United States,* 314 U.S. 534, 546, 62 S.Ct. 366, 86 L.Ed. 432 (1942); *accord, Atchison, Topeka & Santa Fe Ry. v. Board of Trade,* 412 U.S. 800, 806, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973). Where, as here, the administrative body is charged with the responsibility of regulating a utility which provides essential public services, many subtle and intangible factors, quantitative as well as qualitative, must be considered. *Id.*; *Securities and Exchange Commission v. New England System,* 390 U.S. 207, 211, 88 S.Ct. 916, 19 L. Ed.2d 1042 (1968). Accordingly, this court's review is necessarily limited, especially "where the question is one of specific application of a broad statutory term," here "reasonable and just." *National Labor Relations Board v. Hearst*

---

tion, *Staff Investigation Report, In re Bayonne Bridge, George Washington Bridge, Goethals Bridge, and Outerbridge Crossing Tolls* (involving the 1906 Act). Plainly, proper deference must be given to the Administrator's Opinion and Order.

23. The District of Columbia Circuit said in *Greater Boston Television Corporation, supra* at 851:

> If satisfied that the agency has taken a hard look at the issues with the use of reasons and standards, the court will uphold its findings, though of less than ideal clarity, if the agency's path may reasonably be discerned, though of course the court must not be left to guess as to the agency's findings or reasons.

24. The need for the agency to spell out its reasoning was further amplified by Chief Judge Bazelon in *Citizens Association of Georgetown, supra:*

> The case for requiring a statement of reasons from an administrative agency is a persuasive one. Those reasons may be crucial in order for the court to know what the agency has really determined, hence what to review. Courts ought not to have to speculate as to the basis for an administrative agency's conclusions; nor can a court "assume without explanation that proper standards are implicit in every act of agency discretion." And, when faced with a complex problem, having widespread ramifications, like that before us today, a court should surely have the benefit of the agency's expertise. Finally, the articulation of reasons by an agency—for itself and for the public—does afford a safeguard against arbitrary and careless action and is apt to

*Publications, Inc.*, 322 U.S. 111, 131, 64 S.Ct. 851, 860, 88 L.Ed. 1170 (1944).[25]

It does not detract from the court's ultimate authority in matters of statutory construction to recognize that an administrative body properly performs its function by molding the statutory requirement to the specific situation with which it is presented. *NLRB v. Hearst, supra* at 130–31, 64 S.Ct. 851.[26]

The following principles therefore guide this court in its review: the Administrator's decision be supported by substantial evidence,[27] be consistent with the statutory authority delegated by Congress, and be the product of reasoned decision-making.

## IV. THE ADMINISTRATOR'S OPINION IS THE PRODUCT OF REASONED DECISION–

## MAKING AND IS SUPPORTED BY "SUBSTANTIAL EVIDENCE"

Three factors have been identified which govern the court's review of the Administrator's decision: compliance with the statutory mandate, reasoned decision-making, and the "substantial evidence" test, this last requirement being of critical importance.

The Administrator correctly recognized the components of the "reasonable and just" requirement set forth in Section 503 of the Bridge Act: the ability of the DRPA to support its public facilities and meet its obligations to its bondholders and the relevant public interests, namely the conservation of fuel and the interest of the toll payers in reasonable and just tolls.[28] *Supra.*

result in greater consistency in an agency's decisionmaking.
*See also Greater Boston Television Corp., supra.*

**25.** *See generally SEC v. Chenery Corp., supra,* 332 U.S. at 208, 67 S.Ct. 1575; *Atlantic Refining Co. v. Federal Trade Commission,* 381 U.S. 357, 367–368, 85 S.Ct. 1498, 14 L.Ed. 2d 443 (1965). In *Hope Natural Gas, supra,* dealing with reasonable and just rates, the Supreme Court observed:

The fact that the method employed to reach [the] result may contain infirmities is not . . . important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences [citations omitted].

**26.** The practical application of the "reasonable and just" requirement of the General Bridge Act of 1946, 33 U.S.C. § 526, necessarily calls for the making of empirical judgments, as well as the consideration of many complex and sometimes contradictory interests (i. e. the energy crisis, the environmental crisis, the economic needs of the DRPA, as well as the toll-paying public). Text *infra*, Section IV.

**27.** While this court adheres to the "substantial evidence" test in its review, it is instructive to note that Justice Harlan appears to

suggest in *Permian Basin, supra* 390 U.S. at 767, 88 S.Ct. [1344,] at 1360, that the scope of review in rate cases may even be narrower:

Section 19(b) of the Natural Gas Act provides without qualification, that the "finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." More important, we have heretofore emphasized that Congress has entrusted the regulation of the natural gas industry to the informed judgment of the Commission, and not to the preferences of reviewing courts. A presumption of validity therefore attaches to each exercise of the Commission's expertise, and those who would overturn the Commission's judgment undertake "the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." *FPC v. Hope Natural Gas Co., supra* 320 U.S., at 602, 64 S.Ct., at 288. We are not obliged to examine each detail of the Commission's decision; if the "total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end." *Ibid.*
*See* K. Davis, *Administrative Law Treatise* § 29.07 (Supp.1970).

**28.** Although the Administrator did not state so explicitlly, there is implicit in his analysis the conclusion that the toll-paying public would be harmed by the allowance of excessive tolls. For example, the Administrator stated that the DRPA should not be allowed an excessive revenue return, Administrator's Opinion, at 15, and further found that the DRPA has more revenue than is necessary, *id.* at 18.

Therefore, the Administrator acted within the statutory authority delegated to him.

█ The Administrator correctly noted the public interest in fostering the conservation of gasoline, and the possible effect of higher tolls in achieving this goal. Administrator's Opinion, at 14, 17. At the same time, he recognized that permitting higher tolls in order to discourage vehicle traffic would have the effect of allowing the Authority to retain unneeded revenue, exceeding that amount required to finance its operations and meet its bond commitments. Administrator's Opinion, at 15.

The Administrator was acutely aware of the complexities of the situation which faced him. Consequently, his toll schedule attempts to balance two contradictory positions: higher tolls, unneeded revenue, and traffic reduction against lower tolls, less revenue and an increase in traffic. Administrator's Opinion, at 17.[29] That the Administrator attempted to reconcile two equally valid, but potentially contradictory, concerns should not detract from his decision. Indeed, the Administrator's recognition that he was not operating in a black and white area, but rather in a gray area which necessitated the making of careful and subtle judgments, is exemplary.

The main feature of the schedule is a substantial reduction in the carpool commuter rate from 25 cents per crossing to 10 cents per crossing.[30] The purpose of this reduction was to attract some one-passenger car commuters to carpools. In this way traffic might be reduced and gasoline conserved. Administrator's Opinion, at 17.[31] The schedule also effects a reduction in bus fares, for the stated purpose of foregoing a fare increase.[32] Further, the Administrator reduced the cash toll for commuters in half (from 10 cents to 5 cents), while retaining the $12.00 rate for the 30-day decal for this group of bridge users. Finally, the basic cash toll is reduced from 60 cents to 55 cents. *Id.* at 17. The rationale for the latter two reductions is to "[reduce] to some extent the amount of revenue received by the Authority which the Administrator feels is necessary. The reductions are not of sufficient amount so as to encourage automobile traffic." *Id.* at 18.[33]

Clearly, the Administrator gave careful consideration to the competing values involved, and devised a toll schedule, which, to a remarkable degree, reconciles two potentially contradictory public interests, while at the same time providing for the furtherance of both interests. The Supreme Court's admonition in *Hope Natural Gas, supra,* that it is "the

It logically follows from these findings that any reduction in tolls would necessarily benefit the toll-paying public.

29. *See also id.,* at 15–16 Administrator's Supplemental Opinion, at 2.

30. The new schedule is set forth at Appendix A of the Administrator's Opinion.

31. The DRPA attacks the Administrator's finding on this point as being unsupported by substantial evidence. To be sure, the record evidence is sparse. See 1974 Transcript, Vol. III, at 93–94, 100, 141–43. However, the testimony at the April 1974 hearing concerned the Administrator's initial implementation of a modest carpool reduction in his December 23, 1973 Order. (25 cents per crossing). Clearly, common sense dictates that a 60% reduction in the carpool rate, as provided in the Administrator's most recent Order, will be

a substantial inducement to commuters to join carpools (see Administrator's Supplemental Opinion, at 2), and will attract some one-passenger car commuters to carpools.

32. This reduction ($1.00 to 80 cents for two-axle buses and $1.50 to $1.20 for three-axle buses) clearly serves the valid public interest of maintaining reasonable and just tolls for bus commuters.

33. The DRPA does not appear to dispute the Administrator's finding that the Authority achieved coverage in the ratio of at least 1.44 in 1974. *Id.* at 15. ("Coverage" is defined at note 40, *infra*). The evidentiary basis for this finding is substantial, resulting, as it does from arithmetical calculations utilizing the Authority's own data. While the Administrator might have used a better word than "feels," such as "concluded," his essential conclusion is incontrovertible.

impact of the rate order which counts" bears repetition, as the manifest impact of the Administrator's order is the implementation of a toll schedule that will be reasonable and just in its effect.[34]

Thus, the Administrator's identification of the relevant, but contradictory, public interests and his reconciliation of these interests in the new toll schedule constitute the product of reasoned decision-making. Furthermore, his treatment of the record evidence is eminently rational in its methodology, reflecting this same process. The decision likewise is supported by substantial record evidence.

The court's review of the record supports the Administrator's determination that the Administrative Law Judge correctly rejected the Authority's 1974 Refunding Plan because "it lacks the requisite degree of accuracy and basis in fact to justify its implementation." Administrator's Opinion, at 8.[35] The Administrator's rejection of the Administrative Law Judge's Recommended Decision to reinstate the pre-April 1972 tolls is also supportable. The Administrative Law Judge did not have before him the June 1974 Refunding Program, containing the most current data available relating to the financial structure of the Authority.[36] Indeed, the Administrator's decision to reopen the record to include data bearing on the Refunding Plan (Exhibits 136–139) cannot be faulted. This data was the most current evidence available on the critical question of bond coverage, and, as such, it properly operated as a major factor in the determination. Administrator's Opinion, at 9.

Nor can issue be taken with the Administrator's decision to rely on Exhibit 136, the DRPA's Prospectus, rather than Exhibit 139, the DRPA's 1975 budget, in computing operating and maintenance and administrative expenses in Appendix F, wherein the Administrator estimates debt service coverage for the years 1975–1978 under his toll schedule. As the Administrator observed, the 1974 Prospectus "served to persuade the public to purchase DRPA's bonds [and] appeared to be the best source for calculating the future estimated debt coverage of the Authority." [37] Further, the Administrator's considered judgment not to utilize the 1975 DRPA Budget in estimating debt coverage is supported by substantial and uncontradicted record evidence indicating the existence of a

---

34. See note 22, *supra.*

35. In his Recommended Decision of October 16, 1974 (at 10–11) the Administrative Law Judge stated:

We direct our attention to the Port Authority bond coverage and the financing plan designated as Plan II (Exhibits 126, 127). The record shows that the refinancing plan in the amount of $56,000,000 was prepared in March 1974 and adopted by the Authority in April 1974. The justification was said to be to prevent a "valley of coverage", i. e. below the mandatory 1.20 figure beginning in 1978 (Jones, V. II [erroneously designated as V. III] p. 68., Exhibit 127). However sound and desirable this plan may be in its concept, it lacks the requisite degree of accuracy and basis in fact to justify its implementation. It is based on assumptions, verbally reported, (V. III p. 102) was compiled without the benefit of financial data, failed to take into consideration the upward trend of traffic, incorporated misleading information (V. III p. 103) and erroneously included the sum of $2,000,000 (V. II [erroneously designated as V. III] p. 142). Lastly it employed revenues projected in the bond prospectus in 1972, Exhibit 7, ignoring the fact that the revenues were running at a higher rate (Jones, V. II p. 84) than projected. The record speaks for itself as to the reliability of this evidence.

The Administrative Law Judge had only the bare outlines of the Plan in the record before him, since the Plan was not adopted until June 1974, subsequent to the April 1974 Hearing.

36. The stated purpose of the Refunding Plan was "to alleviate a problem which we see in 1978 through 1985, of a valley of coverage ranging from 1.09 to 1.13 as shown in the 1972 prospectus. Testimony of Robert W. Jones, DRPA's municipal bond expert, 1974 Transcript, Vol. II, at 68.

37. Administrator's Supplemental Opinion, at 5.

cushion of approximately 5% in DRPA budgets.[38] Clearly, if the DRPA's operating, maintenance, and administrative figures are inflated by 5%, their utilization in computing debt service will not present an accurate picture. Even utilizing the 1975 Budget figures, as the Authority does in its Appendix F–1,[39] the Authority, by its own calculations, still obtains coverage in the ratio of 1.-33, 1.26, 1.26 and 1.21 for the years 1975, 1976, 1977 and 1978 respectively.[40]

Further, the Administrator's rejection of long-term revenue projections by the DRPA in favor of a four-year projection is entirely rational.[41] As the Administrator observed: "complete reliance upon such projections for toll setting purposes is not necessary, nor is it wise in face of changing conditions such as the failure to open new bridges, failure to issue authorized bonds, or reduction in traffic due to gasoline shortage." Administrator's Opinion, at 13. The Administrator's rejection of long term projections concerning the questionable reliability of traffic estimates and the energy crisis is supported by the testimony of the DRPA's own traffic expert.[42]

In addition, the DRPA asserts that the Administrator's Order is fatally defective because he misread Section 712 of the Bond Covenant to require, before tolls could be reduced, coverage in the ratio of 1.60 in the preceding calendar year or 1.40 in each of two preceding years. Administrator's Opinion, at 11. This misstatement was corrected by the Administrator in his Order of July 10, 1975 (Administrator's Supplemental Opinion, at 3), wherein he states:

"DRPA may reduce tolls or fares if in the preceding calendar year a coverage of at least 1.6 has been achieved, *and, among other things,* if in each of the two succeeding years, *it is estimated* that a coverage of at least 1.4 *will be* achieved." (Emphasis added by the Administrator).

This misstatement is, as the Administrator correctly noted, simply irrelevant to the finding made by the Administrator that the proposed toll schedule allows "a return comfortably above the covenanted 1.2 return." *Id.* Indeed, too much of the DRPA's case rests upon its misplaced focus on Section 712 which permits the DRPA voluntarily to reduce tolls. The DRPA mistakenly overlooks, if not ignores, the Administrator's legal authority to effect an involuntary reduction in tolls. (Text *infra,* Section V). The fact that the Administrator's order allows for coverage within the covenanted range between 1.20 and 1.60 negates any argument that he exceeded his legal authority.

All parties, including the Authority, appear to agree that the Administrator's proposed toll schedule will not adversely affect the ability of the DRPA to maintain and operate its public facilities, i.e. the bridges and the highspeed line. See Administrator's Opinion, at 15.[43] The critical issue which this court must consider in its review of the record is whether the proposed toll schedule provides adequate bond coverage, it already having been determined that the schedule advances the relevant public interests involved. The Administrator projects estimated debt service coverage in Appendix F of his Opinion and Order. The following question must therefore

38. 1972 Transcript, Vol. IV, at 1172–1178; 1974 Transcript, Vol. II, at 4–5.

39. See Brief for Plaintiff.

40. "Coverage" may properly be defined as the ratio of net revenues available for bond service to the Authority's bond service obligations. See 1972 Transcript, Vol. III, at 681; 1974 Transcript, Vol. II, at 93.

41. In its 1969 Refunding Program estimates were made on a fifteen-year basis; in the 1974 Refunding Program revenue was projected on a twelve-year basis. Administrator's Opinion, at 12–13.

42. 1972 Transcript, Vol. IV, at 1091, 1094 (traffic); 1974 Transcript, Vol. III, at 85 (energy crisis).

43. The DRPA's complaint (para. 28), as well as its brief, is silent on this point.

be answered: Is Appendix F supported by substantial evidence?[44]

Appendix F (set forth in full at note 44) is based on exhibits supplied by the Authority, chief among them the 1974 Prospectus (Exhibit 136), which the DRPA distributed, as required by law, to the bond community and the investing public as an accurate and true picture of the DRPA's financial position.[45] Manifestly, Exhibit 136 provides substantial evidence for the coverage ratios set forth in Appendix F. Substantial record testimony, "more than a mere scintilla," *Consolidated Edison Co., supra,* exists to support the toll income estimates.

Indeed, the Authority's figures speak for themselves.[46] The evidence relied upon by the Administrator (Exhibits 136–139) does not misrepresent the facts, nor is it equivocal. Hypothesizing for the purpose of illustration, if the data disclose that toll revenues are x amount of dollars and expenses are y amount of dollars, then the "proper inferences to be drawn from the . . . undisputed evidence" is that z amount of

**44.**

### APPENDIX F

Estimated Debt Service Coverage
Under Toll Schedule Prescribed in This Order a
(000's omitted)

| | 1975 | 1976 | 1977 | 1978 |
|---|---|---|---|---|
| Adjusted Toll Income | 32,449 | 35,119 | 36,277 | 36,705 |
| Less Disc. | −790 | −842 | −868 | −875 |
| | 31,659 | 34,277 | 35,409 | 35,830 |
| M&O Expenses | −10,256 | −13,773 | −14,599 | −15,476 |
| Admin. Expenses | −2,088 | −2,234 | −2,369 | −2,511 |
| | 19,315 | 18,270 | 18,441 | 17,843 |
| Invest. Income | +3,898 | +3,790 | +3,682 | +3,466 |
| | 23,213 | 22,060 | 22,123 | 21,309 |
| Debt. Service Req. Rev. Bonds | 16,769 | 16,769 | 16,769 | 16,769 |
| Rev. Bdg. Debt * Service Coverage | 1.38 | 1.31 | 1.31 | 1.27 |
| Total Debt Service Reqt. | 19,868 | 19,271 | 19,672 | 19,134 |
| Total Debt Service Coverage including special Revenue Bonds | 1.16 | 1.14 | 1.12 | 1.11 |

a The toll income estimates shown in this appendix are based on traffic estimates shown in Table 6, Appendix A, Exhibit 136. Actual 1974 traffic was substituted for the estimates shown in Table 6 and each subsequent year's increase was based on the increase shown in Table 6. The M&O and administrative expenses and investment income estimates were derived by using the same method described above and were based on estimates found on pages 21 and 22 of Exhibit 136.

* *Court's explanatory note.* The Rev. Bdg. Debt Service Coverage is the coverage ratio with which the court must concern itself. The bottom line, Total Debt Service Coverage including special Revenue Bonds, includes the Special Revenue Bonds issued in 1974. See note 51. On these bonds the DRPA is only obligated to maintain 1.00 coverage. Hence, the bottom line coverage, which is not in issue here, is lower than the coverage on the other bonds, where 1.20 coverage must be maintained.

45. *See generally* 15 U.S.C. § 77*l*(2).

46. This point bears heavily on the Authority's claim that it has been denied its procedural right to due process with respect to the Administrator's utilization of Exhibits 136–139. Text *infra,* Section VI.

dollars, (x–y), is available for bond coverage. *Television and Radio Artists, Kansas City Local v. National Labor Relations Board,* 129 U.S.App.D.C. 399, 395 F.2d 622, 628 (1968).[47] This is precisely the evidence and the methodology which underlie Appendix F.

Appendix F is therefore supported by substantial evidence. The projected coverage, 1.38, 1.31, 1.31 and 1.27 in 1975, 1976, 1977 and 1978 respectively, is more than adequate and falls within the 1.20–1.60 range contemplated by the Authority's bond covenants.[48] This court is not unmindful of the grave importance of insuring that the Authority meet its bond commitments.[49] The Administrator's proposed toll schedule achieves just this result. °

The Administrator's Order and Opinion, considered as a whole and as the sum of its component parts, reflects a reasoned decision-making process supported by substantial evidence.

47. One DRPA expert stated that the process of calculating bond coverages was "a matter of simple arithmetic . . . . , inexorable arithmetic." 1974 Transcript, Vol. III, at 128.

48. See Exhibit 42, Section 712 of the Bond Covenant. *Infra* note 52.

49. At the present time, where a default on its bonds by the nation's largest city appears likely, the question of debt coverage cannot be treated lightly. The DRPA's financial situation is fundamentally different from that confronting New York City. In the instant case, the Administrator's toll schedule allows the Authority to meet its bond commitments with an adequate safety margin.

Even if coverage were to fall below 1.20, a default would not occur. See Section 711 (3) of the Bond Covenant. Note 51, *infra.*

The Authority is in a different position for another reason. Its 1969 Bond Resolution was floated to finance a program of major capital improvements, i. e. the construction of two new bridges and a high speed line. In its 1974 Bond Resolution the Authority restructured its debt. The capital construction program is essentially complete. Any future improvements, such as to the high speed line, would not, it is anticipated, be financed through new bonds. 1972 Transcript, Vol. III, at 877, Vol. IV, at 1194; 1974 Transcript, Vol. I, at 92.

## V. EFFECT OF THE BOND COVENANT ON THE ADMINISTRATOR'S AUTHORITY TO SET A TOLL SCHEDULE PURSUANT TO SECTION 503 OF THE GENERAL BRIDGE ACT OF 1946

■ Manifestly, the decisive finding made by the Administrator is supportable. The new toll schedule allows the Authority to meet its bond commitments, and still maintain the desired margin of safety. This critical finding is not strenuously challenged by the Authority.

Nevertheless, it appears, as the Administrator observed, that the Authority is, in effect, challenging the new toll schedule on an alternative basis—that only the DRPA has the authority, by virtue of covenants with its bondholders, to set tolls. Administrator's Supplemental Opinion, at 3. If this were so, the Administrator's proposed toll schedule would obviously be invalid.

The proposed schedule does not jeopardize the bond covenant for still another reason. The bond covenant limits the payment of bonds from the Authority's Revenue Fund, preventing the use of income from the General Fund and other sources to meet bond commitments. But it is clear that income from the General Fund could be utilized, if necessary, to repurchase the DRPA's bonds on the open market, and thereby obviate any coverage problems. 1972 Transcript, Vol. IV, at 1168; 1974 Transcript, Vol. I, at 126, Vol. Vol. II at 116–17. In considering the overall picture, in the unlikely event that default should become a real possibility, the DRPA's substantial investment income (see Exhibit 137) would have to be considered. *Cf.* 1972 Transcript, Vol. V, at 1203.

While the bond covenant speaks in terms of coverage of at least 1.20, it is nevertheless evident that coverage in the ratio of 1.00 in any given year is, in fact, sufficient though certainly not desirable, to meet the bond commitment.

Finally, if the experience under the new toll schedule demonstrates serious bond coverage problems, the Authority still has the remedy of petitioning the Administrator to prescribe tolls which are reasonable and just under changed circumstances which may then exist. 49 C.F.R. § 310.3.

The Delaware River Port Authority was created in 1952 by a Compact between the Commonwealth of Pennsylvania and the State of New Jersey approved by Congress on July 17, 1952. Pub.L. No. 82–573, 66 Stat. 738. The Compact authorizes the DRPA "to make, enter into and perform any and all such covenants and agreements with the holders of such bonds or other obligations as [it] may determine to be necessary or desirable for the security and pay-ment" of such obligations. Article IV (j), 66 Stat. at 741. Pursuant to this authority the DRPA entered into a covenant with its bondholders. See Exhibit 42.[50] Section 711 of the Bond Covenant requires the Authority to charge tolls, which shall, equal, after provision for operating expenses (including reasonable and necessary reserves and working capital), one hundred twenty per centum (1.20) of the Aggregate Bond Service for each calendar year.[51] The DRPA may

50. Under its General Bond Resolution of 1969 the DRPA established a Refunding and Construction Program to refund its then existing debt and to construct the Commodore Barry Bridge, the Betsy Ross Bridge, PATCO, a new centralized maintenance building and new approaches to the Benjamin Franklin and Walt Whitman Bridges. See Exhibit 7. Bonds were issued thereunder in May 1969, July 1970, May 1972, and October 1972.

A subsequent refunding program was undertaken in June 1974. This 1974 Bond Resolution authorized the issuance of $27,270,000 series 1974 Special Revenue Refunding Bonds, maturing January 15, 1990, and $20,545,000 Series 1974 Special Obligation Refunding Bonds, maturing January 15, and July 15, 1975–1985. See Exhibit 136. Administrator's Opinion, at 6–7.

51. On the Special Revenue Bonds issued in 1974 the DRPA need only maintain a coverage of 1.00. See 1974 Prospectus, Exhibit 136, at 39.

Section 711 provides (Exhibit 42, at 49–51):

Section 711. *Maintenance of Tolls, Fares and Other Charges.*

(1) The Authority shall at all times after delivery of the Bonds fix, charge and collect such tolls, fares, rents and other charges for transit over or use of the Projects as shall be required in order that, in each calendar year the total Revenues, together with any proceeds to the Authority of the use and occupancy insurance referred to in Section 713, after the payment therefrom of all amounts reasonably required for Operating Expenses and provision therefrom of reasonable and necessary reserves and working capital for such purposes, and as shall be required to pay or discharge all other charges and liens whatsoever payable of out of the Revenue Fund other than Aggregate Bond Service, shall equal at least one hundred twenty per centum (120%) of the Aggregate Bond Service for said calendar year.

(2) The Authority further covenants that on or before the 20th day of October in each calendar year it will complete a review of its financial condition for the purpose of estimating whether the Revenues for such calendar year will be sufficient to provide the amounts referred to in paragraph (1) of this Section for such calendar year and shall by resolution make a determination with respect thereto. A copy of such resolution, certified by the Secretary, together with a certificate of the Chairman or the Vice-Chairman of the Authority setting forth a reasonably detailed statement of the actual and estimated Revenues and Operating Expenses and other pertinent information for such calendar year with respect to which such determination was made, shall be filed with the Trustee on or before said 20th day of October. If the Authority determines that such Revenues may not be sufficient to provide such amounts, it shall forthwith cause the Traffic Engineer to make a study for the purpose of ascertaining the schedules of tolls for the use of the Projects which, in the opinion of the Traffic Engineer, will cause sufficient Revenues to be collected in the following calendar year to provide the amounts referred to in said paragraph (1) for such following calendar year and will cause additional Revenues to be collected in such following and later calendar years sufficient to restore the amount of such deficiency by such date as the Traffic Engineer estimates is the earliest possible date. If, in any calendar year, Revenues collected shall not have been sufficient to provide the amounts referred to in said paragraph (1) for such calendar year, the Authority shall, unless it has theretofore obtained a study in compliance with the immediately preceding sentence, forthwith cause the Traffic Engineer to make a study for the purpose stated in such sentence, and shall, as promptly as practicable, in any case no later than the next April 1, establish and place in effect the schedules of tolls as recommended by the Traffic Engineer.

(3) The failure in any calendar year to comply with the covenant in paragraph (1)

reduce tolls if in the preceding year coverage of at least 1.60 has been achieved, and, among other things, if coverage of at least 1.40 be achieved in the two succeeding years.[52]

Clearly, the Administrator's proposed toll schedule does not provide coverage in the ratio contemplated in Section 712 for a toll reduction.[53] The Authority argues therefore that the Administrator,

in effect, forces the Authority to abrogate its Bond Covenant. But, this position is incorrect, as Section 712 merely establishes the conditions prerequisite to a "voluntary" reduction of tolls by the Authority.

The Administrator has the legal authority to effect an "involuntary" reduction of the tolls.[54] Indeed, it is funda-

---

of this Section shall not constitute an event of default under the provisions of Section 1001, if the Authority shall comply with paragraph (2) of this Section; *provided, however,* that if the Traffic Engineer shall be of the opinion that no schedule of tolls, fares or other charges will produce sufficient Revenues in accordance with said paragraph (2) of this Section, then the Authority shall fix and establish such schedule of tolls, fares and other charges as the Traffic Engineer, in a certificate filed with the Authority, states will enable the Authority to comply as nearly as possible with said paragraph (2), and in such event the failure of the Authority to comply with paragraphs (1) and (2) of this Section shall not constitute an event of default under the provisions of Section 1001.

52. Section 712 (Exhibit 42 at 51) :
Section 712. *Reduction of Tolls, Fares, Rents and Other Charges.* The Authority may not reduce any tolls, fares, rents or other charges for transit over or use of the Projects unless
(a) in the preceding calendar year total Revenues, together with any proceeds to the Authority of the use and occupancy insurance referred to in Section 713, after the payment therefrom of all amounts reasonably required for Operating Expenses and provision for reasonable and necessary reserves therefor and working capital, and all amounts required to pay or discharge all other charges and liens whatsoever payable out of Revenues other than Aggregate Bond Service, at least equal one hundred sixty per centum (160%) of the Aggregate Bond Service for said calendar year,
(b) there shall have been filed with the Trustee a Traffic Engineer's Certificate setting forth the proposed schedule of reduced tolls, fares or other charges and setting forth, in the opinion of the signer, the estimated Revenues for the succeeding two calendar years under the proposed schedule,
(c) there shall have been filed with the Trustee a Consulting Engineer's Certificate setting forth, in the opinion of the signer, the amount of Operating Expenses

estimated to be incurred by or on account of the Authority from the operation of the Projects for the succeeding two calendar years, and
(d) the amount by which the estimated Revenues set forth pursuant to subparagraph (b) of this Section exceeds the estimated Operating Expenses set forth pursuant to subparagraph (c) of this Section equals at least one hundred forty per centum (140%) of the Aggregate Bond Service for said calendar years,
except that the Authority may in any calendar year change any schedule of tolls, fares or other charges if there has been filed with the Trustee a Traffic Engineer's Certificate stating, in the opinion of the signer, that such change will not result in a reduction in Revenues.

53. The Administrator projects that the new toll schedule would provide the following bond coverage: 1.38 in 1975, 1.31 in 1976, 1.31 in 1977 and 1.27 in 1978. Administrator's Opinion, Appendix F.

54. The Intervenor suggests that the Administrator's proposed schedule is not, in fact, a reduction in tolls, but rather the disallowance of an excessive increase in favor of a more modest and fairer increase (from 50 cents to 55 cents). Seen from a historical perspective, this characterization is not without merit. The Authority raised its basic cash toll from 50 cents to 60 cents in April 1972. This increase engendered public protest, resulting in the initiation of public hearings by the Federal Highway Administrator. The Administrator consistently has found through these proceedings that the tolls charged by the Authority are unreasonable and unjust. Even though the Administrator sanctioned the present tolls on December 21, 1973, he did so only "on an interim basis," until further hearings could be had and evidence adduced. It is evident that the Authority's April 1972 increase has never been found to be reasonable and just. Notwithstanding, the Authority has been permitted to maintain this increase during the pendency of these proceedings, now some three and one-half years later.

mental that the reasonableness and justness of the DRPA's tolls must be determined by the Administrator, and in the final analysis by the court.

It is curious that the Authority should even suggest that it, and not the Administrator, is the final arbiter of the reasonableness and justness of its tolls.[55] The Authority's Prospectus (Official Statement) distributed to the bond community and the investing public explicitly recognized the legal authority of the Federal Highway Administrator to prescribe reasonable and just tolls.[56] Consider the language found in the 1974 Prospectus:

> Under the provisions of the General Bridge Act of 1946, tolls on interstate bridges, including the Bridges operated or to be operated by the Authority, are required to be reasonable and just.

Under regulations promulgated under said Act, any person may initiate proceedings before the Federal Highway Administrator, or the Administrator may initiate proceedings on his own initiative, at any time for the purpose of examining whether the tolls are reasonable and just and, if the tolls are found not reasonable or just, after specified procedures the Administrator may prescribe the tolls to be charged. Exhibit 136, at 17.[57]

Plainly, the bondholders entered into the bond covenant with full knowledge of the nature and scope of the power of the Federal Highway Administrator to prescribe reasonable and just tolls.[58]

▆▆▆ The bond covenant is clearly subordinate to the General Bridge Act of 1946 and the Administrator's power to regulate tolls thereunder. Any doubt

---

The court does not, however, accept Intervenor's position, as to do so would reduce the issue to characterization of the proposed schedule as an increase or a decrease. The issue is simply whether the Administrator's toll schedule is reasonable and just.

55. In support of the assertion that no presumption of expertise should attach to the Administrator's decision, the DRPA states (Brief for Plaintiff, at 59–60) :

[T]he Delaware River Port Authority is a public corporate instrumentality vested with the general power to fix tolls in support of its regional purposes by a Congressional consent which is considerably more detailed than the very narrow review powers accorded the Federal Highway Administrator under Section 503 of the General Bridge Act, *even if Section 503 is applicable.* The Commissioners of the Authority are, in the majority, gubernatorial appointees responsive to specific regional needs of the public through the political representatives of the public.

They are men of great stature and business ability bringing to bear on Authority policy literally hundreds of man years of experience wtih regional problems and the interstate needs of South Jersey and Philadelphia. They are charged with setting toll schedules to support the needs of the Authority and do so only after careful planning by and with the advice of nationally-recognized, expert consultants. *The governmental review contemplated by Section 503 of the General Bridge Act, if it applies,* cannot hope to substitute informed judgment of the

quality exercised by the Commissioners in the area of "fine tuning" the Authority's toll schedules to regional needs (emphasis added). But see note 22, *supra.*

To accept the DRPA's "philosophy of government" set forth above would be to adopt the principle that the DRPA is not subject to the legal authority of the Administrator, and ultimately the court. Such a proposition has no place in our constitutional system. *Cf. United States v. Nixon,* 418 U.S. 683, 703–13 (1974) (President's generalized privilege of confidentiality subordinate to specific need for evidence in criminal trial) ; *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 588 (1952) (law-making power of Congress not subject to Presidential supervision or control).

56. Exhibit 7 is the 1972 Prospectus and Exhibit 136 is the 1974 Prospectus.

57. *Id.* at iii, 2 ; 1972 Prospectus, Exhibit 7, at iii, 2, 20.

58. Such knowledge held by the bondholders distinguishes the case at bar from *Patterson v. Carey,* 370 N.Y.S.2d 783 (Sup.Ct.1975), *appeal docketed,* No. 26542, App.Div., July 9, 1975. There the court found that the bond covenant could not be breached by later government action, since the primary consideration for the purchase of the bonds had been a nonintervention pledge by the government. *Id.* at 792. Conversely, implicit here is a pledge of intervention, taking the form of the prescription of reasonable and just tolls by the Federal Highway Administrator.

on this point is removed by reference to the Compact, wherein Congress conditioned its approval with the proviso that nothing in the Compact "shall be construed to affect, impair, or diminish any right, power, or jurisdiction of the United States or of any court, department, board, bureau, officer, or official of the United States, over or in regard to any navigable waters, or any commerce between the States or with foreign countries." 66 Stat. 738.[59]

Colorado Interstate Gas Co. v. Federal Power Commission, 142 F.2d 943 (10th Cir. 1944), aff'd 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206 (1945) is instructive, as it bears upon the important question of the relationship of private contract (i. e. the bond covenant) to the federal regulatory power. In that case several private gas companies entered into contracts relating to prices to be charged consumers. Subsequent thereto, Congress enacted the Natural Gas Act, delegating to the FPC the determination of reasonable and just rates. The court observed that the power of Congress to regulate interstate commerce could not be subordinated to preexisting contracts. Id. at 953. It was expressly stated that freedom of contract does not place it within the power of companies engaged in business of that kind to restrict or withhold from the control of Congress at a later time so much of the field of regulation of interstate commerce as they choose to bring within the range of their arrangements. Id.[60]

If the FPC has the power to abrogate preexisting contracts, derived from its authority to regulate rates in interstate commerce, Colorado Interstate Gas Co., supra,[61] can there be any doubt that the Federal Highway Administrator has the like power to prescribe reasonable and just tolls, especially where the bond covenant postdates (not predates as in Colorado Interstate Gas Co.) the passage of the General Bridge Act of 1946? The Authority's argument that the Administrator has impaired a contract, indeed a "solemn pact," [62] between the Authority and its bondholders cannot prevail.[63]

---

59. The legislative history underlying the Congressional approval of the Compact lends solid evidence to the conclusion that Congress intended the Authority be subordinate to the federal regulatory power. House Public Works Committee Report, H.R.Rep.No.2293, 82 Cong., 2d Sess. 3 (1952).

60. See also Dillingham v. McLaughlin, 264 U.S. 370, 374, 44 S.Ct. 362, 68 L.Ed. 742 (1924); Sunray Mid-Continent Oil Co. v. Federal Power Commission, 239 F.2d 97, 100 (10th Cir. 1956), rev'd per curiam on other grounds, 353 U.S. 944, 77 S.Ct. 792, 1 L.Ed. 2d 794 (1957); Philadelphia Coke Co. v. Bowles, 139 F.2d 349, 357 (Em.App.1943); Taylor v. Brown, 137 F.2d 654, 659 (Em. App.), cert. denied, 320 U.S. 787, 64 S.Ct. 194, 88 L.Ed. 473 (1943); Delaware Valley Apartment House Owners Association v. United States, 350 F.Supp. 1144, 1149 (E.D. Pa.1972), aff'd per curiam, 482 F.2d 1400 (Em.App.1973).

61. The Federal Highway Administrator's power to prescribe reasonable and just tolls also derives from the Commerce Clause of the Constitution, Art. I, § 8. See the General Bridge Act of 1946, 33 U.S.C. § 526 and the Compact, 66 Stat. 738.

62. New Jersey Sports & Exposition Authority v. McCrane, 61 N.J. 1, 26, 292 A.2d 545, 558, appeal dismissed, 409 U.S. 943, 93 S.Ct. 270, 34 L.Ed.2d 215 (1972).

63. Art. I, § 10 of the Constitution, which provides that no state shall impair the obligation of contracts, is inapposite here, because the Administrator's order is federal action.

Even if the impairment clause was applicable, First National Bank v. Maine Turnpike Authority, 153 Me. 131, 165–71, 136 A.2d 699, 718–21 (1957) cited by the DRPA, which held that the state legislature could not impair a contract between the Authority and its bondholders, is distinguishable as that case dealt with a bond covenant predating the legislative action. See generally, United States Trust Co. v. New Jersey, 134 N.J. Super. 124, 338 A.2d 833 (Law Div.1975), certification granted, 68 N.J. 174, 343 A.2d N.J.S.Ct., 1975.

Although the Authority is correct in emphasizing that the courts are sensitive to impairment of contracts by the federal government, the situation alleged to exist here, this sensitivity reflects Fifth Amendment due process concerns, rather than the impairment clause. See generally, Fornaris v. Ridge Tool Co., 423 F.2d 563, 566–67 (1st Cir.), rev'd

In summary, the bond covenant, which defines the rights and duties of the Authority vis-à-vis its bondholders, is subordinate to the General Bridge Act of 1946. The Administrator's power to set reasonable and just tolls is paramount, subject, of course, to the court's review.

## VI. THE CLAIM OF DENIAL OF DUE PROCESS (EXHIBITS 136–139)

In his Opinion the Administrator states that Exhibits 136–139 played "a major part in the decision." Administrator's Opinion, at 9. The DRPA urges that the introduction of Exhibits 136–139 into evidence and the Administrator's reliance on these exhibits violated its Fifth Amendment right to due process of law. Specifically, the DRPA contends that the Administrator should have reopened the hearing and permitted Exhibits 136–139 to be examined in an adversary hearing with oral argument and the opportunity for testimony, either on direct or cross-examination.

The resolution of this procedural due process claim must, of necessity, require a consideration of the course followed by the Administrator, with due regard given to the exigent situation which faced him. The character of the exhibits is plainly a critical element in determining whether they should have been exposed to an adversary hearing.

The Administrative Law Judge held hearings on April 23, 24 and 25, 1974, and rendered his Recommended Decision on October 16, 1974. Prior to this decision, but subsequent to the April hearing, the Authority embarked upon a $47 million refunding plan on June 15, 1974.

The refunding plan had been generally discussed at the April hearing.[64] The Administrative Law Judge found, however, that the presentation lacked "the requisite degree of accuracy and basis in fact." [65]

Confronted with this problem the Administrator directed, by Order, on February 10, 1975, that the Authority submit certain documents to him:

1. The 1974 official statement of the DRPA authorizing the issuance of refunding bonds in 1974 (the Prospectus) (Exhibit 136).

2. The finanical statement of the Authority for the calendar year 1974, including toll revenues by classes of vehicular traffic (Exhibit 137).

3. Traffic counts for calendar year 1974 by toll classes of vehicles (Exhibit 138).

4. The Authority's 1975 proposed budget (Exhibit 139).

Because the refunding plan "would certainly have the effect of altering the debt service requirements of the Authority, the precise nature of which is essential to the process of determining the reasonableness or justness of tolls in this case," [66] the Administrator determined that it was imperative to study the requested documents. In his Order he delineated the procedure to be followed with respect to these documents:

Upon receipt of these documents, the Administrator will label the documents for identification purposes and transmit said documents to all parties of record to this proceeding, including the Delaware River Port Authority, and said parties may within

*per curiam on other grounds,* 400 U.S. 41, 91 S.Ct. 156, 27 L.Ed.2d 174 (1970); *Thorpe v. Housing Authority,* 393 U.S. 268, 278 n. 31, 89 S.Ct. (1969); *cf.* Hale, "The Supreme Court and the Contract Clause," 57 Harv.L.R. 852, 890–91 (1944); Hochman, "The Supreme Court and the Constitutionality of Retroactive Legislation," 73 Harv.L.R. 692, 695 (1960).

If any Fifth Amendment claim is to be made, it must be that the DRPA has been deprived of its property without just compensation in violation of the due process clause of the Fifth Amendment. But the Administrator's Opinion and Order allows the DRPA to maintain its operations. Consequently, this Fifth Amendment claim is without merit.

64. 1974 Transcript, Vol. II, at 67–74.

65. Recommended Decision, October 16, 1974, at 10. See Administrator's Opinion, at 8.

66. Order, February 10, 1975. See Administrator's Opinion, at 8.

20 days of receipt of such documents, submit to the Administrator, with service on the other parties of record:

(1) Objections;

(2) Comments and briefs concerning the documents; and/or

(3) Petitions for a hearing.

After receipt of the objections, comments or petitions, the Administrator will further consider reopening the record for inclusion of the additional information into the official record of the proceeding and notify the parties of his findings. Thereafter, the Administrator will proceed with his determination as to the reasonableness and justness of tolls to be charged for the transit of vehicles over the bridges operated by the Delaware River Port Authority.

In accordance with this procedure, the Administrator, by letter of February 26, 1975, submitted Exhibits 136–139 to all record parties for their consideration. He directed the parties to submit within twenty days their "objections, comments, or petitions for rehearing." On March 17, 1975 the DRPA, through counsel, responded by letter to the Administrator, challenging the possible entry of Exhibits 136–139 into evidence, contending that the existing record was adequate. Alternatively, in the event that the record was reopened to include Exhibits 136–139, the DRPA petitioned the Administrator "to reopen the record for such additional testimony and exhibits as it deems appropriate so that Exhibits 136, 137, 138 and 139 may be appropriately related to the issues in the previous record and the record made current." The self-evident conclusion to be drawn from the Authority's letter of March 17, 1975 is that it made a calculated and intentional decision not to submit comments or a brief. By his Order of March 26, 1975 the Administrator included Exhibits 136–139 as part of the official record. Additional hearings were not held as the Authority had requested. The Administrator rendered his decision on May 19, 1975.

In support of its contention that it has been denied due process, the DRPA places considerable reliance on *West Ohio Gas Co. v. Public Utilities Commission*, 294 U.S. 63, 55 S.Ct. 316, 79 L.Ed. 761 (1935). In that case the Commission was charged with the responsibility of setting fair and reasonable rates. Without giving notice to the company, the Commission entered an *ex parte* order providing for the inclusion of four annual reports of the company into the record. The Commission then predicated its determination on these reports. This procedure, the Supreme Court concluded, denied the company "the fundamentals of a fair hearing" since an "[o]pportunity did not exist to supplement or explain the annual reports . . . ." *Id.* at 70.

But here the DRPA had notice and knowledge of the Administrator's proposed use of Exhibits 136–139. Further, the Administrator, through his February 10, 1975 Order and his letter of February 26, 1975, afforded the DRPA an opportunity to "supplement or explain" the exhibits. Plainly, the requirements imposed by the Supreme Court in *West Ohio Gas* were satisfied by the Administrator.

Notwithstanding, the DRPA contends that the comment procedure placed it in the impossible position of having to respond to comments from several different parties, to meet their counter-responses, and to anticipate any conceivable interpretation and use the Administrator might make of the exhibits. But, this erroneous assumption misinterprets the reality of the situation. The Authority was on notice as to the precise use the Administrator intended to make of the exhibits, since the Administrator's Order of February 10, 1975 clearly stated that his primary concern was to examine what effect the refunding plan would have upon the Authority's debt service requirements. Hence, the Authority could have directed its comments, brief or petition for a hearing to the precise question of what effect Ex-

hibits 136–139, the most current financial data available, would have on the question of bond coverage. The Authority chose not to do so, a decision by which it now must abide.

The salient characteristic of Exhibits 136–139 is that they consist of raw data. Exhibit 136, the Authority's 1974 Prospectus, upon which the Administrator placed great reliance in reaching the bond coverage which would be achieved under the new toll schedule,[67] consists in part, of various tables setting forth traffic and revenue projections. These tables were prepared by the Authority's own experts. Exhibit 137 is the Authority's final and complete balance sheet for 1974. In Exhibit 138 the Authority sets forth traffic counts by toll classes of vehicles for 1974. Exhibit 139 is the Authority's budget for 1975, the current calendar year.

It bears repetition that Exhibits 136–139 speak for themselves. Thus, if for the purpose of illustration, the data reveal toll revenues in the amount of x dollars and expenses in the amount of y dollars, then the proper inference to draw from the undisputed evidence is that z amount of dollars, (x–y), is available for bond coverage. *Television and Radio Artists, supra.* (Text *supra,* Section IV).

■ Assuming that the Administrator denied the Authority an opportunity to rebut exhibits submitted by an adverse party, which is not the case here perhaps the Authority could be heard to complain. *See National Small Shipments Traffic Conference, Inc. v. United States,* 321 F.Supp. 500, 509 (S.D.N.Y. 1970) (dictum).[68] It is a most dubious

proposition that a party in an administrative proceeding has the right to cross-examine its own documents (or even to explain them on direct examination), particularly where the exhibits consist largely of traffic and revenue figures, data which cannot be disputed and which are not susceptible of interpretation. Hence, the character of the evidence was such that further hearings were unnecessary.[69] This case is not one where the administrative agency indulged in complex theorizing from the record without testing its calculations or the theories underlying them through experts. *See National Small Shipments Traffic Conference, supra* (dictum). The calculations made by the Administrator were purely mathematical and not particularly complex. Because the bond service requirements remain constant,[70] the only calculations required to be made involved the amount of net revenues available for bond service, a figure reached by the simple arithmetical process of subtracting operating and maintenance and administrative expenses from gross toll revenues.

■ Procedural due process does not always require oral argument. *Federal Communications v. WJR, The Goodwill Station,* 337 U.S. 265, 275, 69 S.Ct. 1097, 93 L.Ed. 1353 (1949); *United States v. Florida East Coast Ry.,* 410 U.S. 224, 241, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973); *Frozen Foods Express, Inc. v. United States,* 346 F.Supp. 254, 260–61 (W.D.Tex.1972); *Boston and Maine R.R. v. United States,* 208 F.Supp. 661, 669–70 (D.Mass.1962). Rather, the right to be heard orally "varies from case to case in accordance with differing circum-

67. See Administrator's Opinion, Appendices F, G and H.

68. Whether cross-examination is required in an administrative hearing depends on the circumstances presented in each individual case. *International Harvester Co., supra* at 631. This determination is properly left to the discretion of the administrative agency. *Loesch v. Federal Trade Commission,* 257 F.2d 882, 885 (4th Cir.), *cert. denied,* 358 U.S. 883, 79 S.Ct. 125, 3 L.Ed.2d 112 (1958).

69. The Administrative Procedure Act, 5 U.S.C. § 556(d), under which the within proceedings were conducted, provides that "[a] party is entitled . . . to conduct such cross-examination *as may be required for a full and true disclosure of the facts*" (emphasis added). *See generally* 2 Davis, *Administrative Law Treatise, supra,* § 1415.

70. See Administrator's Opinion, Appendix F; Brief for Plaintiff, Appendix F–1.

**1142**

stances, as do other procedural regulations." *The Goodwill Station, supra* 337 U.S. at 276, 69 S.Ct. at 1103. Where, as here, Exhibits 136–139, by their very nature, presented "[n]o material issues of fact . . . in dispute" an oral hearing was not required to be held. *Allied Van Lines Co. v. United States,* 303 F.Supp. 742, 749 (C.D.Cal.1969); *Frozen Food Express, supra* at 260; *National Trailer Convoy, Inc. v. United States,* 293 F.Supp. 634, 636 (N.D.Okl. 1968).

Under the circumstances it was neither necessary nor desirable to reopen the proceedings for additional testimony and oral argument. The Administrator exercised proper judgment in affording the parties the opportunity to propound their views in writing, at the same time refusing to reopen the record. *Arthur Murray Studio v. Federal Trade Commission,* 458 F.2d 622, 624 (5th Cir. 1972); *Shachtman v. Dulles,* 96 U.S. App.D.C. 287, 225 F.2d 938, 941 (1955).[71] The Authority was given ample opportunity to present its position to the Administrator concerning Exhibits 136–139, as it was likewise afforded every opportunity to be heard throughout these long proceedings. The DRPA was not prejudiced as a result of the Admin-

istrator's decision not to reopen the proceedings. *Arthur Murray Studio, supra.*

The procedure followed here was proper and fair to all parties. The requirements of the due process clause of the Fifth Amendment were satisfied.

## VII. THE NATIONAL ENVIRONMENTAL POLICY ACT (NEPA)

The DRPA claims that the Administrator was required, pursuant to NEPA, 42 U.S.C. § 4332,[72] to file an Environmental Impact Statement (EIS). It is alleged that the Administrator's failure to file an EIS renders his action, the implementation of the new toll schedule, unlawful.

 The necessary prerequisite to the raising of the environmental impact statement issue is, or course, the proper showing of standing by the DRPA. Article III of the Constitution, which expressly limits the exercise of the judicial power to "cases" and "controversies," provides the basic framework for analysis of the standing question. *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 151–52, 90 S.Ct. 827, 25 L.Ed.2d 184

71. The Supreme Court stated in *Reilly v. Pinkus,* 338 U.S. 269, 276, 70 S.Ct. 110, 114, 94 L.Ed. 63 (1949) : "A large amount of discretion in the conduct of a hearing is necessarily reposed in an administrative agency."

72. 42 U.S.C. § 4332 provides :

The Congress authorizes and directs that, to the fullest extent possible : (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes . . . . .

(1970). To demonstrate standing a plaintiff must establish a personal stake and interest in the outcome of the controversy. This requirement makes certain that the resolution of disputes between parties will take place in an adversary contest. *Baker v. Carr*, 369 U. S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *see also Flast v. Cohen*, 392 U. S. 83, 101, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 220–21, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *Warth v. Seldin*, 422 U.S. 490 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

 To make the requisite showing of standing, the DRPA must demonstrate both that "the challenged action has caused [it] injury in fact" *and* that it is "within the zone of interests to be protected or regulated" by NEPA. *Data Processing, supra* 397 U.S. at 152–53, 90 S.Ct. at 829; *see Cape May County Chapter, Inc., Izaak Walton League v. Macchia*, 329 F.Supp. 504, 511 (D.N.J. 1971); *Environmental Defense Fund v. Tennessee Valley Authority*, 468 F.2d 1164, 1171–72 (6th Cir. 1972); *Natural Resources Defense Council, Inc. v. Securities and Exchange Commission*, 389 F.Supp. 689, 697 (D.D.C.1975); *Natural Resources Defense Council, Inc. v. Grant*, 341 F.Supp. 356, 367–68 (E.D.N.C. 1972).[73] Injury to an environmental interest may be sufficient to meet the "injury in fact" test. *Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). However, the plaintiff "seeking review [must] be [itself] among the injured." *Id.* at 735, 92 S.Ct. at 1366; *see Sierra Club v. Mason*, 351 F.Supp. 419, 422 (D.Conn.1972); *Environmental Defense Fund v. TVA, supra; O'Brien v. Brinegar*, 379 F.Supp. 289, 290 (D.Minn.1974) (dictum). The plaintiff must allege "a distinct and palpable injury to [itself] . . . ." *Warth v. Seldin, supra* 95 S.Ct. at 2206 (1975); *see United States v. Students Challenging Reguatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

 Further, a causal connection must be demonstrated between the action complained of and the alleged injury. *Warth v. Seldin, supra*, 95 S.Ct. at 2208; *S. v. D.*, 410 U.S. 614, 617–18, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973); *Sierra Club*, 405 U.S. at 735, 740, 92 S. Ct. 1361. The plaintiff must "establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." *Warth v. Seldin, supra; see also Paton v. LaPrade*, 524 F.2d 862 (3rd Cir., filed Oct. 14, 1975).

Applying the foregoing principles of the law of standing to the DRPA's pleadings, it is plain beyond doubt that the Authority has failed to satisfy the "injury in fact" test. Paragraph 32 of the DRPA's complaint alleges:

> The Administrator has not considered that his Order reducing the tolls is major Federal action significantly affecting the quality of the human environment in the Delaware Valley, and thus requires an environmental impact statement per Section 102 of the National Environmental Policy Act (42 U.S.C.A. § 4332).

Absent from Paragraph 32 is any allegation that the DRPA will suffer injury resulting from the implementation of the Administrator's toll schedule.

Rather, Paragraph 32, generously construed, appears to raise by implication the environmental interests of the citizens of the Delaware Valley. The DRPA argues that the Administrator's toll schedule, insofar as it lowers the commuter and basic cash toll, will add to urban congestion and pollution.[74]

---

73. *See also Barlow v. Collins*, 397 U.S. 159, 164, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 212, 93 S.Ct. 364, 34 L.Ed. 2d 415 (1972); *Reservists Committee to Stop the War, supra*, 418 U.S. at 227 n. 16, 94 S.Ct. 2925.

74. It would seem that the Administrator's reductions in the carpool and bus rates would

**1144**

Standing cannot be based upon a "generalized grievance" held in common by all or a large class of citizens. *Warth v. Seldin, supra* 95 S.Ct. at 2205; *Paton v. LaPrade, supra.* Nor is the assertion of the rights of third parties sufficient, without more, to confer standing. *Warth v. Seldin, supra; see Barrows v. Jackson,* 346 U.S. 249, 255, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). Of course, if the plaintiff makes the requisite showing of actual injury suffered by itself, the claims of third parties, as well as those of the general public, may properly be advanced and ultimately adjudicated; but the DRPA has made no such showing here.

The only possible harm which the DRPA might suffer from the implementation of the Administrator's toll schedule is economic in nature, i.e. decreased revenues from lower tolls. But such injury, if any,[75] does not fall within the zone of interests which NEPA seeks to protect. *Clinton Community Hospital Corp. v. Southern Maryland Medical Center,* 374 F.Supp. 450, 455 (D.Md.), *aff'd per curiam,* 510 F.2d 1037, 1038 (4th Cir. 1974), *cert. denied,* 422 U.S. 1048 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975); *cf. Duke Lumber Co. v. Butz,* 382 F. Supp. 362, 373–74 n. 35 (D.D.C.1974). In *Clinton Hospital Corp.,* the court observed that the plaintiff's real aim was not to protect the environment, but rather to prevent the building of a competitive hospital nearby, and found that the plaintiff lacked standing. 374 F.Supp. at 455. The DRPA's position here is virtually the same as that of the Clinton Community Hospital Corporation.

The DRPA has not satisfied the two-part test of *Data Processing.* It has not demonstrated that it will be injured if the Administrator's toll schedule is implemented. Nor has it established that it is within the zone of interests to be protected by NEPA. Therefore, the DRPA has no standing to challenge the Administrator's alleged failure to file an EIS. It follows that the court need not consider whether the Administrator's toll schedule is major federal action significantly affecting the quality of the human environment. 42 U.S.C. § 4332.[76]

## VIII. CONCLUSION

The court reaches the conclusion that the Administrator's toll schedule is lawful in all respects. Accordingly, the motions of the Defendants and the Intervenor for Summary Judgment are granted, and the motion of the Plaintiff for Summary Judgment is denied.

The toll schedule set forth in Appendix A of the Federal Highway Administrator's Opinion and Order of May 19, 1975 shall take effect at 12:01 a. m., December 1, 1975, in accordance with the court's Order entered this date.

have a positive environmental impact. See Administrator's Supplemental Opinion, at 7.

75. Any injury would appear to be *de minimis,* since the Administrator's schedule allows the DRPA to maintain its public facilities and meet its commitments to the bondholders.

76. The Administrator addressed the merits of the NEPA issue in his Supplemental Opinion, at 6–7, concluding that the implementation of the toll schedule did not require an EIS. See note 74, *supra.*